Melisa A. Rosadini-Knott
mrosadini@peifferwolf.com
(California Bar No. 316369)
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE LLP**
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010-1923
323-982-4109

[Additional counsel listed on signature page]
*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEONA CAZARES, MICHAEL WALSH, and LAURA WILLIS-ALBRIGO, *individually and on behalf of all others similarly situated,*<br><br>*Plaintiffs,*<br><br>v.<br><br>LG ELECTRONICS U.S.A., INC. and ALPHONSO INC.,<br><br>*Defendants.* | Case No.:<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs Leona Cazares, Michael Walsh, and Laura Willis-Albrigo, individually and on behalf of all similarly situated persons, allege the following against Defendants LG Electronics U.S.A., Inc. ("LG") and Alphonso Inc. ("Alphonso," and collectively with LG, "Defendants") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. LG's televisions are no longer passive entertainment devices. Sitting in millions of American living rooms, their "Smart TVs" operate as sophisticated surveillance systems—continuously capturing what appears on the screen and transmitting detailed records of consumers' viewing behavior to manufacturers and advertising companies.

2. LG manufactures and sells internet-connected televisions used by millions of consumers across the United States. LG has integrated into these devices Automatic Content Recognition ("ACR") technology and related tracking systems (collectively, the "LG ACR Tools") that monitor and analyze what consumers watch in their homes.

3. Alphonso is an advertising and data analytics company that provides ACR technology, content recognition services, and cross-device advertising infrastructure. Alphonso works in concert with LG to receive, process, and monetize data derived from consumers' television viewing activity.

4. Unbeknownst to consumers, LG Smart TVs incorporate the LG ACR Tools, which capture snippets of audio and video from whatever content is displayed on the screen, generate a unique digital "fingerprint," and transmit that fingerprint and related data to Alphonso and other third parties. These systems operate continuously and automatically, enabling Defendants to determine precisely what a user is watching, in real time.

5. LG Smart TVs incorporate ACR technology that captures snippets of audio and video from whatever content is displayed on the screen, generates a digital fingerprint, and transmits that fingerprint and related data to Alphonso and other third parties. These systems

operate continuously and automatically, enabling Defendants to determine precisely what a user is watching in real time—across all inputs, applications, and connected devices.

6. In connection with this monitoring, LG collects and transmits persistent identifiers associated with the television and the household, including IP addresses, device identifiers, and other unique identifiers that enable LG, Alphonso, and their partners to distinguish and recognize devices—and individuals—over time.

7. LG and Alphonso combine consumers' viewing activity with these identifiers—and with additional identifiers obtained from other sources, such as hashed email addresses and mobile advertising IDs—to link the television to other devices associated with the same individual or household, including smartphones, tablets, and computers.

8. Through these practices, Defendants construct cross-device linkages and identity profiles that associate specific individuals and households with detailed records of their viewing behavior tracked across platforms and contexts.

9. The information collected and derived through these practices (the "Sensitive Information") includes: (i) consumers' video-viewing activity and the specific content they watch; (ii) information displayed on the television screen during use; (iii) device-level and network identifiers, including IP addresses and persistent device identifiers; (iv) cross-device identifiers and linkages, including identifiers that associate the television with other devices and accounts; and (v) inferences drawn from the foregoing, including consumers' interests, habits, and personal characteristics.

10. Defendants use this data to generate detailed behavioral profiles and infer sensitive attributes—including political preferences, religious beliefs, health conditions, sexual orientation, family composition, financial status, and personal interests—for targeted advertising and analytics.

11. This data collection and transmission occurs without meaningful, informed consent. LG obscures its ACR surveillance through confusing disclosures, deceptive terminology—including labeling its surveillance program as a "Viewing Information

Agreement"—and manipulative user-interface design that steers consumers into enabling these features.

12. LG's consent architecture further undermines any claim of informed consent by presenting multiple agreements during device setup, encouraging users to select all options in order to proceed, and requiring dozens of steps across multiple menus to disable tracking once enabled.

13. As a result, Plaintiffs and millions of LG Smart TV owners have had their viewing behavior continuously captured, transmitted to Alphonso and other third parties, and monetized without their knowledge or consent.

14. Defendants' conduct violates numerous federal and state privacy laws and constitutes an unlawful invasion of consumers' privacy.

15. Moreover, Defendant LG's tracking of Smart TV users violated the Video Privacy Protection Act ("VPPA"), which was passed specifically to prevent the disclosure and aggregation of data relating to an individual's video consumption.

16. As a result of Defendants' conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with electronics retailers; (iii) emotional distress and heightened concerns related to the release of Sensitive Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Information; (vi) statutory damages; and (vii) continued and ongoing risk to their Sensitive Information.

17. Therefore, Plaintiffs seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendants: invasion of privacy – intrusion upon seclusion; invasion of privacy – public disclosure of private facts; invasion of privacy in violation of the California Constitution; violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631, 632, and 638.50–638.51; violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502; violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, et seq.; violation of the VPPA, 18 U.S.C. § 2710; negligence; breach of implied contract; violation

of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.; unjust enrichment; and injunctive relief.

## II. THE PARTIES

### A. Plaintiff Leona Cazares

18. Plaintiff Leona Cazares is a resident and citizen of Banning, California.

19. Plaintiff Cazares purchased one LG Smart TV in approximately 2018 and another in approximately 2025. Since each purchase she has used each LG Smart TV regularly within her home in Banning, California.

20. Plaintiff Cazares, along with other household members and her minor grandchildren, regularly uses the LG Smart TVs to access video-viewing content, including through streaming services such as Netflix, Tubi, Amazon Prime Video, YouTube, Pluto, Fawsome, and Fandango as well as content delivered through broadcast signals and external devices connected via HDMI. The video-viewing content Plaintiff Cazares selected and watched within the privacy of her home constitutes private, sensitive information.

21. Since they were set up, Plaintiff Cazares' LG Smart TVs have operated using LG's webOS platform and related software systems.

22. During Plaintiff Cazares' use of the device, LG's ACR and related content-recognition technologies were enabled and operating, unbeknownst to Plaintiff Cazares, such that the televisions captured, analyzed, and transmitted information regarding the audio and video content displayed on the screens.

23. At no time was Plaintiff Cazares conspicuously or meaningfully presented with, nor did she knowingly agree to, any terms of use, privacy disclosures, or consent mechanisms that adequately described or authorized LG's or its partners' collection, interception, recording, or use of her viewing activity or associated data.

24. Unbeknownst to Plaintiff Cazares, LG's ACR technologies and related tracking systems intercepted, recorded, and disclosed her Sensitive Information during her use of the LG Smart TVs. This included, but was not limited to, the specific programs and content she viewed,

applications she accessed, audiovisual content displayed on her screens, device-level identifiers, and her IP address.

25. LG transmitted this ACR-derived data and associated identifiers to Defendant Alphonso in near real time as Plaintiff Cazares viewed content on her televisions.

26. Alphonso processed this data to identify the specific audiovisual content viewed by Plaintiff Cazares, including programs, advertisements, and other on-screen material, and associated that information with persistent identifiers such as device identifiers, IP addresses, and other signals.

27. Upon information and belief, Alphonso supplemented these data points with additional identifying information obtained from third parties, including hashed email addresses (e.g., SHA-256), mobile advertising identifiers, additional IP addresses, and CTV device identifiers, to facilitate persistent identification.

28. Using these identifiers, Alphonso identified Plaintiff Cazares' televisions and linked them to other devices associated with her household, including mobile phones, tablets, and computers.

29. Alphonso combined these identifiers to construct a unified cross-device identity profile for Plaintiff Cazares and her household, which associated Plaintiff Cazares across multiple devices, platforms, and contexts.

30. Defendants intercepted and recorded Plaintiff Cazares' video-viewing activity in real time or near real time, including content viewed on streaming platforms and through external devices, and associated that activity with identifiers tied to Plaintiff Cazares and her household.

31. This data was used to enable targeted advertising, audience segmentation, analytics, and cross-device tracking. Upon information and belief, Alphonso disclosed or made this data and derived profiles available to advertisers, data brokers, and other third parties, allowing them to target Plaintiff Cazares across her televisions, mobile devices, and computers and to include her in proprietary audience segments and measurement systems.

32. Plaintiff Cazares never authorized Defendants to collect, intercept, record,

analyze, monetize, or disclose her Sensitive Information. Plaintiff Cazares did not consent to the interception or recording of her viewing activity or device identifiers, the creation of cross-device identity profiles, or the use of her private viewing behavior for advertising or other commercial purposes.

**B. Plaintiff Michael Walsh**

33. Plaintiff Michael Walsh is a resident and citizen of Whittier, California.

34. Plaintiff Walsh purchased an LG Smart TV in approximately 2024 and has used it regularly since then within his home in Whittier, California.

35. Plaintiff Walsh, along with one other household member, regularly uses the LG Smart TV to access video-viewing content, including through streaming services such as Netflix, and Amazon Prime, as well as content delivered through broadcast signals and external devices connected via HDMI. The video-viewing content Plaintiff Walsh selected and watched within the privacy of his home constitutes private, sensitive information.

36. Since it was set up, Plaintiff Walsh's LG Smart TV has operated using LG's webOS platform and related software systems.

37. During Plaintiff Walsh's use of the device, LG's ACR and related content-recognition technologies were enabled and operating, unbeknownst to him, such that the television captured, analyzed, and transmitted information regarding the audio and video content displayed on the screen.

38. At no time was Plaintiff Walsh conspicuously or meaningfully presented with, nor did he knowingly agree to, any terms of use, privacy disclosures, or consent mechanisms that adequately described or authorized LG's or its partners' collection, interception, recording, or use of his viewing activity or associated data.

39. Unbeknownst to Plaintiff Walsh, LG's ACR technologies and related tracking systems intercepted, recorded, and disclosed his Sensitive Information during his use of the LG Smart TV. This included, but was not limited to, the specific programs and content he viewed,

applications he accessed, audiovisual content displayed on his screen, device-level identifiers, and his IP address.

40. LG transmitted this ACR-derived data and associated identifiers to Defendant Alphonso in near real time as Plaintiff viewed content on his television.

41. Alphonso processed this data to identify the specific audiovisual content viewed by Plaintiff Walsh, including programs, advertisements, and other on-screen material, and associated that information with persistent identifiers such as device identifiers, IP addresses, and other signals.

42. Upon information and belief, Alphonso supplemented these data points with additional identifying information obtained from third parties, including hashed email addresses (e.g., SHA-256), mobile advertising identifiers, additional IP addresses, and connected TV ("CTV") device identifiers, to facilitate persistent identification.

43. Using these identifiers, Alphonso identified Plaintiff Walsh's television and linked it to other devices associated with his household, including mobile phones, tablets, and computers.

44. Alphonso combined these identifiers to construct a unified cross-device identity profile for Plaintiff Walsh and his household, which associated Plaintiff Walsh across multiple devices, platforms, and contexts.

45. Defendants intercepted and recorded Plaintiff Walsh's video-viewing activity in real time or near real time, including content viewed on streaming platforms and through external devices, and associated that activity with identifiers tied to Plaintiff Walsh and his household.

46. This data was used to enable targeted advertising, audience segmentation, analytics, and cross-device tracking. Upon information and belief, Alphonso disclosed or made this data and derived profiles available to advertisers, data brokers, and other third parties, allowing them to target Plaintiff Walsh across his television, mobile devices, and computers and to include him in proprietary audience segments and measurement systems.

47. Plaintiff Walsh never authorized Defendants to collect, intercept, record, analyze, monetize, or disclose his Sensitive Information. Plaintiff Walsh did not consent to the interception

or recording of his viewing activity or device identifiers, the creation of cross-device identity profiles, or the use of his private viewing behavior for advertising or other commercial purposes.

**C. Plaintiff Laura Willis-Albrigo**

48. Plaintiff Laura Willis-Albrigo is a resident and citizen of San Diego, California.

49. Plaintiff Willis-Albrigo purchased an LG Smart TV in approximately 2023 and has used it regularly since then within her home in San Diego, California.

50. Plaintiff Willis-Albrigo, along with one other household member, regularly uses the LG Smart TV to access video-viewing content, including through streaming services such as Netflix, Paramount, HBO Max, Hulu, Amazon Prime and Hulu, as well as content delivered through broadcast signals and external devices connected via HDMI. The video-viewing content Plaintiff Willis-Albrigo selected and watched within the privacy of her home constitutes private, sensitive information.

51. Since it was set up, Plaintiff Willis-Albrigo's LG Smart TV has operated using LG's webOS platform and related software systems.

52. During Plaintiff Willis-Albrigo's use of the device, LG's ACR and related content-recognition technologies were enabled and operating, unbeknownst to her, such that the television captured, analyzed, and transmitted information regarding the audio and video content displayed on the screen.

53. Plaintiff Willis-Albrigo did not participate in the initial assembly, installation, or configuration of the LG Smart TV. Those steps were performed by her spouse. At no time was Plaintiff Willis-Albrigo presented with, or did she agree to, any terms of use, privacy disclosures, or consent mechanisms describing or authorizing LG's or its partners' collection, interception, recording, or use of her viewing activity or associated data.

54. Unbeknownst to Plaintiff Willis-Albrigo, LG's ACR technologies and related tracking systems intercepted, recorded, and disclosed her Sensitive Information during her use of the LG Smart TV. This included, but was not limited to, the specific programs and content she

viewed, applications she accessed, audiovisual content displayed on her screen, device-level identifiers, and her IP address.

55. LG transmitted this ACR-derived data and associated identifiers to Defendant Alphonso in near real time as Plaintiff viewed content on her television.

56. Alphonso processed this data to identify the specific audiovisual content viewed by Plaintiff Willis-Albrigo, including programs, advertisements, and other on-screen material, and associated that information with persistent identifiers such as device identifiers, IP addresses, and other signals.

57. Upon information and belief, Alphonso supplemented these data points with additional identifying information obtained from third parties, including hashed email addresses (e.g., SHA-256), mobile advertising identifiers, additional IP addresses, and connected TV ("CTV") device identifiers, to facilitate persistent identification.

58. Using these identifiers, Alphonso identified Plaintiff Willis-Albrigo's television and linked it to other devices associated with her household, including mobile phones, tablets, and computers.

59. Alphonso combined these identifiers to construct a unified cross-device identity profile for Plaintiff Willis-Albrigo and her household, which associated Plaintiff Willis-Albrigo across multiple devices, platforms, and contexts.

60. Defendants intercepted and recorded Plaintiff Willis-Albrigo's video-viewing activity in real time or near real time, including content viewed on streaming platforms and through external devices, and associated that activity with identifiers tied to Plaintiff Willis-Albrigo and her household.

61. This data was used to enable targeted advertising, audience segmentation, analytics, and cross-device tracking. Upon information and belief, Alphonso disclosed or made this data and derived profiles available to advertisers, data brokers, and other third parties, allowing them to target Plaintiff Willis-Albrigo across her television, mobile devices, and computers and to include her in proprietary audience segments and measurement systems.

62. Plaintiff never authorized Defendants to collect, intercept, record, analyze, monetize, or disclose her Sensitive Information. Plaintiff Willis-Albrigo did not consent to the interception or recording of her viewing activity or device identifiers, the creation of cross-device identity profiles, or the use of her private viewing behavior for advertising or other commercial purposes.

**D. Defendant Corporations**

63. Defendant LG Electronics U.S.A., Inc. ("LG") is a Delaware corporation with its principal place of business at 111 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. LG regularly transacts, solicits, and conducts business throughout California, including by marketing, distributing, and selling Smart TVs to consumers in this District. LG may be served through its registered agent for service of process, Corporation Service Company d/b/a CSC Lawyers Incorporating Service Company, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

64. Defendant Alphonso Inc. ("Alphonso") is a Delaware corporation with its principal place of business in California, including in or around Mountain View, California. Alphonso regularly transacts, solicits, and conducts business throughout California, including by providing ACR technology, content identification services, and advertising analytics services to Smart TV manufacturers such as LG. Alphonso may be served through its registered agent for service of process, CT Corporation, 330 N Brand Blvd., Glendale, California 91203.

65. LG Electronics, Inc. is a global consumer electronics company, and through its North American subsidiary, LG Electronics U.S.A., Inc., it manufactures and sells Smart TVs incorporating ACR technology and related tracking systems (the LG ACR Tools).

66. Alphonso is an advertising technology and data analytics company that provides ACR technology, content recognition services, and cross-device identity and advertising infrastructure. Alphonso receives, processes, and monetizes data derived from consumers' television viewing activity collected through LG Smart TVs.

67. LG knowingly and intentionally incorporated ACR technology into its Smart TVs, including technology developed, operated, or supported by Alphonso, to capture and analyze Plaintiffs' and Class Members' video-viewing activity and other content displayed on their televisions.

68. LG configured its Smart TVs to capture audio and video information from content displayed on the screen, generate content-based fingerprints, and transmit those fingerprints and associated data to Alphonso and other third parties for identification, analysis, and monetization.

69. Alphonso knowingly and intentionally received ACR data transmitted from LG Smart TVs, including content-derived fingerprints and associated identifiers, and used that data to identify the specific content viewed by Plaintiffs and Class Members.

70. Upon information and belief, Alphonso combined ACR-derived viewing data with persistent identifiers and additional data obtained from other sources to create or support cross-device identity graphs linking Smart TVs to individual consumers and households.

71. LG and Alphonso knew that their collection, transmission, and use of Plaintiffs' and Class Members' viewing activity and associated identifiers would enable the tracking of individuals' in-home media consumption and the creation of detailed behavioral profiles.

72. Defendants knowingly and intentionally used these identifiers and viewing data to facilitate targeted advertising, audience segmentation, measurement, and other monetization activities for profit.

73. Defendants knew or should have known that these practices were inconsistent with consumers' reasonable expectations of privacy, including expectations that their in-home television viewing activity would not be continuously monitored, recorded, and shared with third-party advertising and analytics companies.

## III. JURISDICTION AND VENUE

74. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed class contains more than 100 members;

and minimal diversity exists because at least one class member is a citizen of a state different from Defendants.

75. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the VPPA, 18 U.S.C. § 2710, and the ECPA, 18 U.S.C. § 2510 et seq.

76. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, because those claims arise from the same common nucleus of operative facts as the federal claims.

77. This Court has personal jurisdiction over Defendant Alphonso Inc. ("Alphonso") because Alphonso is headquartered in this District and is therefore subject to general jurisdiction here.

78. This Court has personal jurisdiction over Defendant LG Electronics U.S.A., Inc. ("LG") because LG has purposefully directed its conduct toward California and this District, and Plaintiffs' claims arise out of and relate to LG's contacts with this forum.

79. LG designs, manufactures, markets, distributes, and sells Smart TVs throughout California, including within this District, and has placed thousands of such devices into the stream of commerce with the expectation that they will be purchased and used by consumers in this District.

80. LG derives substantial revenue from the sale of Smart TVs in California and from the monetization of consumer data collected from those devices, including data collected from devices located in this District.

81. LG also directs software, tracking technologies, and data collection services toward Smart TVs located in California, including by causing those devices to capture, process, and transmit viewing data to Alphonso and other third parties, including servers and systems located in this District.

82. Upon information and belief, the ACR data collected from Plaintiffs' and Class Members' Smart TVs was transmitted, in whole or in part, to Alphonso in this District for processing, analysis, and monetization.

83. Plaintiffs' claims arise directly out of Defendants' contacts with this District, including the design, deployment, and operation of ACR technology and related data collection and transmission systems that capture and transmit Plaintiffs' viewing activity to Alphonso in this District.

84. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

85. Specifically, Defendants' ACR technology was designed, implemented, and operated in part from this District; ACR data was transmitted to and processed within this District; and Defendants' conduct caused the interception, disclosure, and use of Plaintiffs' and Class Members' viewing activity within this District.

86. Venue is also proper in this District because Defendant Alphonso resides in this District for purposes of 28 U.S.C. § 1391(c).

## IV. LG'S SMART TV BUSINESS

87. LG manufactures and sells Smart TVs in the United States, including devices operating on its webOS platform.

88. LG's Smart TVs are internet-connected devices capable of running streaming applications, connecting to external media devices, and interacting with other smart devices within a consumer's home.

89. LG markets these televisions as convenient, centralized platforms for accessing digital media and streaming services.

90. LG sells millions of Smart TVs in the United States each year and has placed such devices in millions of American households.

91. Because televisions are typically located in shared household spaces—such as living rooms and bedrooms—a single LG Smart TV is regularly used by multiple individuals within a household, including family members and guests.

92. As a result, each LG Smart TV provides LG with access to detailed behavioral and viewing information concerning multiple individuals within the same household.

93. This household-level surveillance allows LG to collect and monetize viewing data not only from the purchaser of the television, but from all individuals who use it—regardless of whether those individuals received notice of or consented to such data collection.

## V. AUTOMATIC CONTENT RECOGNITION TECHNOLOGY

94. Automatic Content Recognition ("ACR") is a technology designed to identify what media content is displayed on a television.

95. ACR operates by capturing portions of the audio and video output from the television and converting those fragments into unique digital "fingerprints."

96. These fingerprints are then compared against databases of known media content to determine the specific program, video, or advertisement being viewed.

97. LG's ACR systems operate continuously or at frequent intervals during device use, enabling near real-time identification of content displayed on the screen.

98. The resulting viewing data—including content identification and associated metadata—is transmitted to remote servers, including those operated by Alphonso, where it is processed, analyzed, and linked to device- and household-level identifiers. This process is illustrated in part in the figure below:

[This space is intentionally blank.]




**Figure 1: Overview of ACR tracking in Smart TVs**

*Source*: Gianluca Anselmi et al., *Watching TV with the Second-Party: A First Look at Automatic Content Recognition Tracking in Smart TVs* (Sept. 10, 2024), https://arxiv.org/html/2409.06203v1.

99. This process enables collection of granular data about what consumers watch, when they watch it, and how long they watch it.

100. This information is highly valuable to advertisers because it enables precise targeting, attribution, and measurement of advertising effectiveness across multiple devices.

101. ACR technology has accordingly become a central component of the CTV advertising ecosystem.

102. Unlike traditional audience-measurement systems such as Nielsen—which rely on voluntary participation and compensate consumers—ACR systems operate continuously, extract data without compensation, and often without meaningful disclosure or informed consent.

103. Regulators have recognized the intrusive nature of ACR. For example, in a recent complaint filed by the Texas Attorney General against major smart-TV manufacturers, including LG, Texas explained that ACR technology works by capturing "audio and visual data of what you're watching on TV … to build a 'fingerprint' of the content" and matching it against a database to identify precisely what is viewed.

104. Notably, within weeks of Texas filing its suit against Samsung for its privacy-invasive, deceptively implemented ACR technology, Samsung agreed to "promptly update its smart TVs and implement disclosures and consent screens that are clear and conspicuous to ensure that Texans can make an informed decision regarding whether their data is collected and how it's used."[1]

## VI. LG'S ACR SURVEILLANCE PROGRAM

105. LG has incorporated ACR technology into its Smart TVs since at least approximately 2013.

106. LG implements this functionality in part through technology that it developed internally and through third-party providers, including Alphonso, which supplies content recognition, data analytics, and advertising infrastructure.

107. Alphonso provides ACR-related services that receive, process, and analyze data derived from LG Smart TVs in order to identify viewed content and support advertising and measurement functions.

108. Within LG Smart TVs, ACR functionality is presented to consumers under labels such as "Viewing Information Agreement" or similar terminology that does not clearly convey the scope of the underlying data collection and surveillance.

109. LG describes these features as providing personalization, recommendations, or enhanced viewing experiences.

---

[1] https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-secures-major-agreement-samsung-ensure-texans-are-protected-smart-tvs

110. In reality, the LG ACR system operates as a continuous surveillance mechanism that captures and analyzes the media displayed on the television.

111. LG's ACR system captures audio and video data during ordinary use, generates content-based fingerprints, and transmits those fingerprints and associated metadata to Alphonso, which identifies the specific content viewed and associates that information with device- and household-level identifiers. Defendants aggregate this data to create viewing profiles used for targeted advertising and cross-device tracking.

112. Because ACR monitors *all* content displayed on the screen, it captures viewing information regardless of source—including content from streaming applications, cable or broadcast television, and external devices connected via HDMI.

113. As a result, Defendants' ACR system surveils viewing behavior even when consumers are using third-party services or devices that are independent of LG.

114. As regulators have observed, ACR technology captures content from streaming apps, cable television, and external devices such as gaming consoles and Blu-ray players, thereby enabling comprehensive monitoring of in-home media consumption.

115. Upon information and belief, the ACR data collected from LG Smart TVs is transmitted to Alphonso systems for processing, including systems located in this District.

## VII. DEFENDANTS' COLLECTION OF HIGHLY SENSITIVE VIEWING DATA

116. The viewing information captured through Defendants' ACR system is highly sensitive and revealing.

117. A consumer's television viewing habits reflect detailed information about that individual's interests, beliefs, and personal circumstances.

118. For example, viewing behavior can reveal information relating to:

- political preferences and affiliations;
- religious beliefs and practices;
- sexual orientation;
- health conditions and medical concerns;

• family composition, including the presence and ages of children; and

• age, socioeconomic status, and other demographic characteristics.

119. Defendants aggregate this viewing data into consumer profiles used for targeted advertising, attribution, and behavioral segmentation.

120. These profiles are linked to persistent identifiers and, upon information and belief, are associated with identifiers tied to other devices belonging to the same individual or household.

121. Through this linkage, LG correlates viewing activity from Smart TVs with data collected from smartphones, tablets, and computers.

122. This cross-device tracking enables Defendants and their advertising partners to construct detailed identity graphs and comprehensive behavioral profiles of consumers across contexts and devices.

123. Alphonso plays a central role in enabling this cross-device linkage by integrating ACR-derived viewing data with advertising and identity-resolution systems used across the digital advertising ecosystem.

## VIII. ALPHONSO'S SURVEILLANCE AND IDENTITY-RESOLUTION BUSINESS

124. Alphonso is not merely a passive service provider to LG. It is an advertising-technology and data-analytics company whose business is built around collecting, identifying, matching, and monetizing television-viewing data across devices. LG itself announced in 2021 that it acquired a controlling stake in Alphonso in order to bring together LG's smart-TV lineup with Alphonso's "data analytics, media planning and activation, and Video AI capabilities," and to create a "first-screen, cross-device advertising platform with integrated analytics" for LG TVs.

125. Alphonso now operates as LG Ad Solutions, incorporated as Alphonso Inc., and publicly describes itself as a global leader in "connected TV and cross-screen advertising." Its business is not limited to helping manufacturers understand whether a television is turned on. Rather, Alphonso markets tools for activation, measurement, attribution, retargeting, and audience extension across connected televisions, linear television, and digital devices.

126. Despite LG acquiring a controlling ownership interest in Alphonso, Alphonso remains a separate corporate entity that operates its own advertising-technology and data-analytics business, including services that received, processed, and monetized ACR-derived viewing data from LG Smart TVs as well as numerous other clients wholly unrelated to LG.

127. Alphonso develops and distributes "Video AI" software for smart televisions and set-top boxes, including automatic content recognition ("ACR") technology. This ACR technology serves as the anchor for Alphonso's identity-resolution system: it continuously captures information about what is displayed on the television screen and transmits that information, along with persistent device identifiers and network-level signals, to Alphonso's systems. Alphonso's service collects video and/or audio information from what the person is watching through the device, regardless of source, including TV, streaming devices, and set-top boxes, in order to determine the programs watched and advertisements seen.

128. In connection with this viewing data, Alphonso collects and receives **multiple categories of identifying signals**, including device type, make and model, operating-system information, timestamps of viewing activity, IP address, and location information. Alphonso also collects or receives additional identifiers associated with the device and household, including advertising identifiers, application-level identifiers, and other persistent or semi-persistent identifiers. **These identifiers are transmitted together with viewing data, allowing Alphonso to associate specific viewing activity with particular devices and network environments**. Alphonso further receives demographic, interest, and other information about users from third-party partners, and shares viewing data, which includes device identifiers, with what it calls "Data Partners" to create products to be sold or otherwise shared with other companies.

129. Alphonso applies both deterministic and probabilistic matching techniques to these signals in order to determine which devices belong to the same household or individual. These techniques include comparing shared IP address patterns, correlating device activity over time, and reconciling identifiers obtained from televisions, mobile applications, and third-party partners. Through this process, Alphonso is able to infer relationships between connected televisions and

other devices—including smartphones, tablets, and computers—used within the same household or by the same user.

130. Alphonso's business model is to collect viewing data from televisions, combine that data with identifiers and partner data, and transform it into advertising products, audience segments, and measurement outputs for brands, agencies, broadcasters, and other market participants.

131. Alphonso has long marketed itself as a company that follows television exposure beyond the television itself. Before LG acquired a significant interest in it, Alphonso described its offerings as including "TV audience extension across digital devices," "closed-loop attribution," and "real-time TV ad campaign measurement," and stated that its video-AI technology was embedded in tens of millions of smart TVs, TV chipsets, set-top boxes, and other connected devices.

132. Alphonso likewise has described itself, after the LG transaction, as part of a platform that combines LG's smart-TV footprint with Alphonso's "deep technology stack for cross-screen media and measurement," and that provides advertisers with "cross-screen targeting data" used for audience extension on connected TV, digital video, and social media, as well as closed-loop attribution for business results.

133. That cross-screen business depends on identity resolution. LG Ad Solutions states that it uses a "household graph" built on "deterministic data" to identify and reach audience segments, and that it uses "deterministic LG ACR data" to define and locate target households based on real viewing behaviors. In practice, this "household graph" is constructed by linking together the multiple identifiers and signals collected from the ACR-enabled television with identifiers observed from other devices and data sources, creating a unified profile that represents a household and its associated devices. LG Ad Solutions also states that its platform analyzes campaign results "across devices," and publicly touts hundreds of millions of "addressable secondary devices" alongside tens of millions of U.S. LG Smart TVs.

134. Alphonso and LG Ad Solutions also publicly promote integrations that tie LG smart-TV data into third-party identity and audience systems. In 2022, LG Ad Solutions announced that its household-level data would be linked to Omnicom's household graph so campaigns could be activated across more than 20 million LG smart-TV households in the United States. In 2025, LG Ad Solutions announced an integration with Unified ID 2.0 to let advertisers leverage first-party data across LG's audience network, and separately announced a partnership with Experian to enrich targeting with demographic, behavioral, and lifestyle insights. **These integrations function as "data bridges," allowing Alphonso to combine television-derived viewing data with external datasets and thereby expand and refine its identity graph across platforms**.

135. Those are not peripheral partnerships. They reflect the core commercial function of Alphonso's business: taking television-derived viewing data and turning it into matched household audiences, cross-device advertising targets, and attribution products that can be used across the digital advertising ecosystem.

136. Alphonso also deployed software development kits ("SDKs") in mobile applications that used microphone-based audio fingerprinting to match television content and enable cross-device advertising. Through these integrations, Alphonso receives identifiers and behavioral data from mobile devices, allowing it to link television viewing activity captured through ACR with activity occurring on smartphones and other personal devices.

137. LG Smart TVs fit directly into that apparatus. Alphonso's own disclosures (which were never meaningfully presented to Plaintiffs or Class Members) state that its smart-TV service collects video and/or audio information from whatever users watch through the device, regardless of source. LG's own acquisition announcement said LG planned to use Alphonso's software and services, including its Video AI capabilities, with LG home-entertainment products and to create an integrated first-screen, cross-device advertising platform. And Alphonso publicly stated in 2020 that its TV audience footprint already included U.S. households across brands including LG.

138. In other words, LG's Smart TVs are not simply consumer electronics that happen to contain an optional recommendation feature. They are a powerful input layer for Alphonso's larger surveillance-capitalist system. Through LG televisions placed in consumers' living rooms and bedrooms, Alphonso is able to obtain granular viewing data from the first screen in the home, associate that data with device and household identifiers, and then use that data to support audience construction, targeting, retargeting, attribution, and cross-device advertising products. The result is a persistent identity graph that links television viewing behavior with multiple devices and identifiers, enabling Alphonso to track users across contexts and over time.

139. Alphonso's role in the LG ecosystem is therefore central, not incidental. LG captures or causes the capture of viewing activity on the television; Alphonso receives or directs the receipt of content-derived data and associated identifiers; Alphonso then matches, links, and aggregates this data into unified profiles, enriches those profiles with partner data, and deploys the resulting identity graph to power audience segmentation, cross-device targeting, retargeting, and attribution systems that reach far beyond the television itself.

## IX. LG'S AND ALPHONSO'S INTEGRATED SURVEILLANCE ARCHITECTURE

140. LG's Smart TVs and Alphonso's data-processing systems operate together as an integrated surveillance and advertising architecture designed to capture, identify, and monetize consumers' in-home viewing activity.

141. LG Smart TVs capture audio and video content during use, process that data into digital fingerprints, and transmit those fingerprints along with metadata to Alphonso.

142. These fingerprints—and associated metadata such as timestamps, device identifiers, and viewing context—are transmitted from the LG Smart TV to remote servers, including those operated by Alphonso.

143. Upon receipt, Alphonso matches these fingerprints to identify viewed content and associates that information with device- and household-level identifiers. In doing so, Alphonso correlates content-derived signals with persistent identifiers such as IP address and device identifiers, enabling it to link specific viewing activity to particular devices and network

environments. These transmissions include content-derived information sufficient to identify the specific programs, advertisements, or audiovisual material viewed, thereby conveying the substance of Plaintiffs' and Class members' video-viewing activity to Alphonso.

144. Alphonso integrates this viewing data into broader identity-resolution systems that link Smart TVs to other devices associated with the same household or user, including smartphones, tablets, and computers. These systems use deterministic and probabilistic matching techniques to associate identifiers observed from the Smart TV with identifiers obtained from other devices and data sources.

145. Through these systems, Defendants create cross-device identity graphs that connect in-home television viewing activity with digital activity occurring on other devices and platforms, forming unified profiles that persist over time and are updated as additional data is collected. This process results in the assignment or maintenance of persistent identifiers—whether internally defined or derived from combined signals—that function as stable reference points for tracking a household or user across devices and over time.

146. This integrated architecture enables Defendants and their partners to use television-derived viewing data to:

- construct audience segments based on real-world viewing behavior;
- target advertisements across connected televisions, mobile devices, and other digital platforms;
- measure advertising exposure and effectiveness across devices; and
- attribute consumer actions to specific advertisements or campaigns.

147. The LG Smart TV serves as a primary data-collection endpoint—and the anchor of the system's identity-resolution architecture—capturing viewing activity from the "first screen" in the home, while Alphonso functions as a central processing and monetization layer that transforms that data into actionable advertising products.

148. *In sequence*, **Defendants (1) capture viewing data on the device, (2) convert it into identifiable signals, (3) transmit those signals to Alphonso, (4) match them to known**

**content, (5) associate them with persistent identifiers, and (6) incorporate them into identity graphs used for advertising and analytics**.

149. Because LG's ACR technology captures content regardless of source, this architecture allows Defendants to monitor and analyze viewing activity even when consumers are using third-party services or devices that are independent of LG.

150. As a result, Defendants' system extends beyond LG's own platforms and enables comprehensive tracking of in-home media consumption across contexts, inputs, and devices, including the linkage of television-derived viewing activity to behavior occurring on mobile devices, computers, and other digital platforms.

151. This architecture operates continuously and invisibly to consumers, without any contemporaneous indication that their viewing activity is being captured, identified, transmitted to third parties, and incorporated into cross-device advertising and identity-resolution systems, including persistent identity graphs that associate viewing behavior with specific devices, households, and inferred users.

152. Defendants designed, implemented, and operated this integrated system for the purpose of extracting, analyzing, and monetizing consumers' viewing behavior and related data, including by enabling real-time or near real-time content identification and cross-device targeting. This matching and association occurs in real time or near real time as well, as viewing activity is captured, processed, and incorporated into identity-resolution systems shortly after it occurs.

153. In combination, LG's device-level capture and Alphonso's data processing and identity-resolution systems transform ordinary television use into a mechanism for continuous surveillance, behavioral profiling, and targeted advertising across the digital ecosystem.

154. Alphonso's own Smart TV privacy materials state that "Alphonso's ACR software is embedded in LG webOS TV products."[2]

[2] https://alphonso.tv/privacy/smart-tvs/smart-tv-privacy/

155. Recent academic forensics confirm that LG Smart TVs transmit ACR traffic to Alphonso-controlled infrastructure. In a 2024 ACM Internet Measurement Conference paper, researchers from UCL, UC Davis, and UC3M conducted a black-box audit of ACR network traffic from LG and Samsung Smart TVs.[3] They found that ACR works by periodically capturing content displayed on the TV screen, generating fingerprints, and transmitting those fingerprints to ACR servers for matching against content libraries. The researchers specifically tested LG Smart TVs across viewing scenarios including linear television, LG Channels/FAST content, OTT apps, HDMI input, screen casting, and idle/home-screen states.

156. For LG specifically, the researchers found that, when ACR was enabled, the LG TV contacted a single Alphonso domain: eu-acrX.alphonso.tv in the UK testing environment and tkacrX.alphonso.tv in the U.S. testing environment, where "X" was a periodically changing number.[4] The paper states that this domain "belongs to Alphonso," which "manages LG Ad Solutions."[5]

157. The researchers' network measurements showed that LG's highest ACR traffic occurred during linear television and HDMI viewing. This is important because it means LG's ACR system was not limited to native LG apps or LG-controlled content. The study found ACR traffic even when the LG Smart TV was used as a "dumb" external display through HDMI, such as when a laptop or gaming console was connected to the TV.[6]

---

[3] Gianluca Anselmi et al., *Watching TV with the Second-Party: A First Look at Automatic Content Recognition Tracking in Smart TVs* (Sept. 10, 2024), https://arxiv.org/html/2409.06203v1.

[4] *Id.*

[5] *Id.*

[6] *Id.*

158. In the U.S. testing phase, the LG TV transmitted approximately 4,612.4 KB to the Alphonso ACR domain during antenna/linear viewing, approximately 4,832.5 KB during LG FAST viewing, and approximately 4,633.5 KB during HDMI viewing.[7]

159. LG's own documentation, as described by the researchers, states that LG ACR captures frames every 10 milliseconds. The researchers observed LG ACR network traffic every 15 seconds and concluded that LG likely batches the frames captured every 10 milliseconds and sends the resulting content fingerprint to the ACR server every 15 seconds, graphed below:[8]




**Figure 2: Example of 10 minutes of ACR traffic on an LG Smart TV**

*Source*: Gianluca Anselmi et al., *Watching TV with the Second-Party: A First Look at Automatic Content Recognition Tracking in Smart TVs* (Sept. 10, 2024), https://arxiv.org/html/2409.06203v1.

160. These findings demonstrate that LG's ACR system operates as a persistent, device-level surveillance mechanism that captures and transmits detailed information about on-screen content—including content viewed through external HDMI devices—in near real time to a third-party advertising company (Alphonso), thereby confirming that LG intercepts and discloses Plaintiffs' private video-viewing activity beyond the confines of LG-controlled applications and without meaningful user awareness or consent.

[7] *Id.*

[8] *Id.*

## X. LG'S MARKETING AND REPRESENTATIONS REGARDING SMART TV FUNCTIONALITY AND PRIVACY

161. LG markets its Smart TVs, including those operating on its webOS platform, as premium entertainment devices designed to provide consumers with seamless access to content and a personalized viewing experience.

162. In its marketing materials and user-facing disclosures, LG represents that features such as "personalized recommendations" and similar functionality enhance the user experience by tailoring content suggestions to the viewer.

163. LG promotes these features as tools that help users discover content, enhance viewing, and personalize their entertainment experience.

164. LG's representations convey that any data collection is limited and user-beneficial, while failing to disclose that it captures and analyzes on-screen content—including content from third-party apps and devices.

165. Nor does LG disclose that this viewing data is transmitted to third parties, including Alphonso, an advertising and data analytics company that receives and processes such data for content identification, advertising, and related purposes.

166. LG further fails to disclose that the data collected through ACR is used, in conjunction with Alphonso's systems and other data sources, to construct cross-device identity linkages and to facilitate targeted advertising across multiple devices and platforms.

167. To the extent LG provides disclosures regarding data collection, such disclosures are incomplete, obscured, and presented, if at all, during initial device setup—often to a different individual than the end users of the television.

168. LG's marketing and disclosures omit material facts necessary to prevent its representations regarding personalization and user control from being misleading.

169. Reasonable consumers, including Plaintiffs, would not expect that simply watching television in their homes would result in the continuous capture, analysis, and disclosure of their viewing activity and associated identifiers to third parties such as Alphonso.

170. Had Plaintiffs known the true nature and scope of LG's data collection and sharing practices, she would not have purchased the LG Smart TV or would have paid substantially less for it.

## XI. LG PURPORTS TO OBTAIN—BUT DOES NOT OBTAIN—CONSUMER CONSENT THROUGH DECEPTIVE DESIGN.

171. LG does not meaningfully disclose its ACR-based surveillance practices to consumers.

172. Instead, LG presents ACR-related terms during the initial Smart TV setup process through a bundled and misleading consent interface that fails to clearly convey the nature and scope of the underlying data collection.

173. During setup, consumers are presented with multiple agreements, including LG's Terms of Use, Privacy Policy, and a separate "Viewing Information Agreement," which governs LG's ACR-based data collection and sharing practices.

174. These agreements are not presented in a clear or conspicuous manner. Rather, the full terms are accessible only through menus that are difficult to access and review during the setup process and require users to (1) abandon the setup process entirely, (2) find the agreements – if they can remember where they are located, and (3) restart the setup process.

175. Nor does the setup interface clearly disclose that such data will be transmitted to third parties, including Alphonso, for content identification, advertising, and cross-device data linkage.

176. LG presents these agreements at a time when consumers are unable to use the television until setup is completed, creating pressure to proceed quickly through the interface.

177. Indeed, *LG's own instructional materials* confirm that consumers are affirmatively steered into accepting its bundled agreements without meaningful choice. In an official LG support video demonstrating the Smart TV setup process, LG instructs users to "***select these two options,***

***then press 'Agree,'*** referring to the "Select All" option that enables every listed agreement at once.[9]

178. As shown in LG's own setup interface, consumers are presented with multiple separate agreements—including the Viewing Information Agreement, Voice Information Agreement, Interest-Based & Cross-Device Advertising Agreement, and others—totaling at least seven distinct agreements, some of which are not visible without scrolling. Rather than guiding users to review or selectively accept these agreements, LG directs users to enable all of them simultaneously and proceed by pressing "Agree."

179. LG's instructions thus reinforce that consumers are expected to accept all agreements in order to complete setup and begin using the television's Smart TV functionality. Indeed, the instructions further dictate that "***the Terms of Use and Privacy Policy are required for you to use the basic Smart services of your TV***," thereby conveying to consumers that acceptance is required for core functionality. By directing users to select all agreements at once, and by conditioning the "basic" services of their smart TV to be required by two of the agreements—***and also conspicuously not mentioning the other five***—LG eliminates any meaningful opportunity for consumers to understand or differentiate between basic functionality terms and those authorizing extensive data collection and sharing practices.

180. These materials demonstrate that LG's consent flow is not designed to obtain informed, voluntary consent, but instead to secure blanket acceptance of multiple, materially different agreements—including those governing ACR-based surveillance and data sharing with third parties such as Alphonso—through a streamlined, single-action "Select All" mechanism.

181. The requirement that users scroll to view all agreements, combined with LG's instruction to select all options without reviewing them, further obscures the scope of the data practices being authorized and ensures that reasonable consumers will not understand that they are consenting to the capture, analysis, and disclosure of their in-home viewing activity.

---

[9] *See, e.g.*, https://www.youtube.com/watch?v=TJtgt47wWcM at timestamp 1:27 through 1:37.

182. LG's own setup guidance thus confirms that its interface is designed to induce rapid, uninformed agreement to surveillance-related terms, rather than to provide clear, conspicuous, and meaningful notice or to obtain valid consent.

183. Upon information and belief, at all times relevant to Plaintiffs and Class Members, LG Smart TV owners have been encouraged to accept multiple agreements at once in order to complete setup, rather than being provided with a meaningful opportunity to review and selectively consent to individual data practices.

184. At the same time, LG provides a "Skip" option for certain aspects of setup, including account creation and agreeing to any named agreements, reinforcing that full agreement to LG's terms is not required for basic television functionality.

185. This design creates confusion as to which terms are necessary, which are optional, and what data practices are being authorized, undermining any purported consent.

186. LG's use of the label "Viewing Information Agreement" further obscures the nature of the ACR feature by failing to communicate that the feature enables continuous monitoring and analysis of on-screen content.

187. Even where consumers attempt to review LG's terms, the relevant disclosures are fragmented across multiple documents and interfaces, including the Privacy Policy and separate agreements, making it difficult for a reasonable user to understand the full scope of LG's data collection and sharing practices.

188. After setup, consumers who wish to disable ACR-related features must navigate through multiple menus and settings to locate and modify the relevant controls.

189. This combination of:

- bundled and obscured disclosures,
- misleading terminology,
- pressure to complete setup quickly, and
- fragmented and burdensome opt-out mechanisms

constitutes a manipulative user-interface design commonly referred to as a "dark pattern."

190. As a result of this design, Plaintiffs and millions of consumers have unknowingly enabled LG's ACR-based data collection and transmission practices, including the disclosure of their viewing activity to Alphonso and other third parties.

191. Because LG's interface fails to provide clear, conspicuous, and meaningful disclosure of its surveillance practices, and fails to obtain informed, affirmative consent, any purported consent obtained through this process is invalid.

## XII. DEFENDANTS PROFIT FROM THEIR SURVEILLANCE OF CONSUMERS.

### A. Defendants Derived Significant Benefits from Their Collection and Use of Plaintiffs' and Class Members' Sensitive Information.

192. The viewing data collected through Defendants' ACR system is extremely valuable.

193. The viewing data collected through LG's Smart TVs and processed through Alphonso's systems is highly valuable in the digital advertising marketplace.

194. Advertisers, data analytics companies, and advertising technology platforms pay substantial sums for access to granular data reflecting consumers' viewing habits, interests, and behaviors.

195. By collecting, analyzing, and monetizing this data, Defendants generate significant revenue through advertising, audience segmentation, attribution, and analytics services.

196. LG has a strong financial incentive to maximize both the volume and granularity of the consumer data it captures through its Smart TVs.

197. Alphonso, in turn, has a strong financial incentive to receive, identify, enrich, and monetize that data through its advertising and cross-device identity-resolution systems.

198. Upon information and belief, Defendants implemented and expanded the ACR system as part of a coordinated strategy to monetize consumer data through targeted advertising and cross-device tracking.

199. The data collected through LG's ACR Tools and processed by Alphonso is used to build household-level and cross-device identity linkages, which are then leveraged to enable targeted advertising across televisions, mobile devices, and computers.

200. These practices allow Defendants and their partners to deliver highly targeted advertisements, measure advertising effectiveness, and sell access to valuable audience segments.

201. As a direct result of their surreptitious collection, use, and disclosure of Plaintiffs' and Class Members' Sensitive Information, Defendants have generated, and continue to generate, substantial revenue attributable to their data-driven advertising and analytics operations.

202. Through these practices, Defendants have been unjustly enriched at the expense of Plaintiffs and Class Members, whose private viewing information was collected and monetized without their knowledge or informed consent.

**B. Plaintiffs' and Class Members' Data Had Independent Financial Value.**

203. Plaintiffs' and Class Members' Sensitive Information has independent economic value in the marketplace for consumer data.

204. Industry data confirms that consumer data has substantial and increasing per-user value, as reflected in growing revenues from targeted advertising and the existence of programs in which companies compensate consumers in exchange for access to their behavioral data, demonstrating that such information is a recognized and tradable asset.

205. According to the financial statements of Facebook, a major data and advertisement broker, the value derived from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[10]

206. Conservative estimates suggest that in 2018, Internet companies earned

[10] Geoffrey A. Fowler, There's no escape from Facebook, even if you don't use it, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Feb. 1, 2025).

approximately $202 per American user from mining and selling data, with projections rising significantly in subsequent years and total industry revenues reaching into the hundreds of billions of dollars.

207. Companies routinely pay for access to user-level behavioral data, including browsing activity, viewing habits, and device-level identifiers, because such data enables precise targeting and profiling. For example, several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

208. By contrast, Defendants obtained Plaintiffs' and Class Members' Sensitive Information without compensation and without informed consent, while retaining the full economic benefit of that data.

209. The unauthorized interception and disclosure of Plaintiffs' and Class Members' Sensitive Information diminished the value of that information and deprived them of the ability to control, license, or otherwise monetize their own data.

210. As a result, Plaintiffs and Class Members have suffered economic harm.

## XIII. DEFENDANTS' USE OF THE ACR TOOLS VIOLATES NUMEROUS STATE AND FEDERAL DATA PRIVACY LAWS.

### A. The Video Privacy Protection Act

211. The VPPA was enacted in 1988 in response to Congress's concern that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599, at p. 7 (1988) (statement of Sen. Patrick Leahy).

212. Congress was particularly concerned with the privacy of individuals' media consumption, recognizing that:

> Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy-of quiet, and reflection. This intimate process should be

> protected from the disruptive intrusion of a roving eye…These records are a window into our loves, lives, and dislikes.

*Id.* (statement of Rep. Al McCandless).

213. Although originally enacted in the context of videotape rentals, Congress has made clear that the VPPA applies to modern technologies, including "'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at p. 2.[11]

214. The VPPA prohibits a "video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider" without the consumer's "informed, written consent… in a form distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b).

215. The statute defines a "video tape service provider" as any person "engaged in the business… of rental, sale, or delivery of… similar audio visual materials." 18 U.S.C. § 2710(a)(4).

216. It further defines "personally identifiable information" ("PII") as information that identifies a person as having requested or obtained specific video materials or services. 18 U.S.C. § 2710(a)(3).

217. LG is a "video tape service provider" within the meaning of the VPPA because it is engaged in the business of delivering video content to consumers, including through its Smart

[11] *See also The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY, SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW (Jan. 31, 2012), *available online at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-videoprivacy-protection-act-protecting-viewer-privacy-in-the-21st-century (statement by Senator Leahy, who originally introduced the VPPA in the Senate: "Now, it is true that technology has changed…but I think we should all agree that we have to be faithful to our fundamental right to privacy and freedom. Today the social networking, video streaming, the cloud, mobile apps, and other new technologies have revolutionized the availability of Americans' information.").

TV platform, which provides access to on-demand streaming services and LG's own video content offerings, including LG Channels.

218. As alleged herein, LG, through its ACR Tools, knowingly intercepts and discloses consumers' video-viewing activity—including the specific programs and content viewed—along with persistent identifiers such as IP addresses, device identifiers, and other data that enable those viewing selections to be associated with a particular individual or household.

219. These disclosures constitute the disclosure of "personally identifiable information" under the VPPA because they identify consumers as having requested or obtained specific video materials or services.

220. LG makes these disclosures to third parties, including advertising and analytics partners, for commercial purposes, including targeted advertising, audience segmentation, and measurement.

221. LG does so without obtaining consumers' informed, written consent in a form that is distinct and separate from other terms, and, in many cases, without providing any disclosure to the actual users of the television whose viewing activity is collected and disclosed.

222. Courts have recognized that the VPPA applies to modern streaming technologies and evolving forms of audiovisual content delivery. *See, e.g.*, *Fan v. NBA Props. Inc.*, No. 23-cv-05069-SI, 2024 U.S. Dist. LEXIS 57205, at *9 (N.D. Cal. Mar. 26, 2024) ("in enacting the VPPA, 'Congress[] inten[ded] to cover new technologies for pre-recorded video content'" and "used 'similar audio visual materials' to ensure that VPPA's protections would retain their force even as technologies evolve").

### B. The Federal Trade Commission Act ("FTC Act")

223. Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibits unfair or deceptive acts or practices in or affecting commerce.

224. The unauthorized collection, use, and disclosure of consumers' personal information—particularly where such practices are not adequately disclosed or are inconsistent with reasonable consumer expectations—constitutes both deceptive and unfair conduct under

Section 5.

225. Defendants' conduct, as alleged herein, is deceptive because LG represents its Smart TVs and related features as tools for personalization and enhanced viewing, while failing to disclose that those features operate by capturing and analyzing on-screen audio and video content—including content viewed through third-party applications and external devices—and transmitting that data to third parties such as Alphonso for advertising, analytics, and cross-device identity profiling.

226. These omissions are material and likely to mislead reasonable consumers, who would not expect that ordinary in-home television viewing results in the continuous interception, analysis, and disclosure of their viewing activity and associated identifiers.

227. Alphonso likewise fails to disclose that it receives, processes, and monetizes consumers' viewing data collected through LG Smart TVs, including by constructing cross-device identity profiles and enabling targeted advertising across platforms.

228. Defendants' conduct is also unfair because it causes substantial injury to consumers, including the loss of control over highly sensitive viewing information and its unauthorized commercial exploitation.

229. This injury is not reasonably avoidable, particularly where disclosures are absent, obscured, or presented only during device setup and often to individuals other than the actual users whose data is collected.

230. The harm caused by Defendants' practices is not outweighed by any countervailing benefits, as the continuous interception and monetization of viewing activity is not necessary to provide core television functionality.

231. Defendants' conduct therefore falls squarely within the types of unfair and deceptive practices prohibited by the FTC Act..

232. The principles reflected in the VPPA and the FTC Act are consistent: consumers' video-viewing activity and associated identifiers are highly sensitive and cannot be collected, analyzed, and disclosed for commercial purposes without meaningful notice and

informed consent. Defendants' ACR-based surveillance practices violate these well-established privacy norms by enabling the continuous interception and monetization of consumers' viewing behavior—precisely the type of undisclosed, pervasive tracking that both Congress and federal regulators have repeatedly sought to prevent.

## XIV. CLASS ALLEGATIONS

233. This action is brought by the named Plaintiffs both individually, and on behalf of the following Classes under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4):

**Nationwide ACR Class:**

All natural persons in the United States who, during the Class Period, used an LG Smart TV on which ACR technology was enabled and that captured, analyzed, or transmitted information regarding audiovisual content displayed on the device.

**Nationwide Identity Graph Class:**

All natural persons in the United States whose viewing activity on an LG Smart TV was used by Defendants, directly or through their partners, to associate that television with one or more other devices, identifiers, or datasets as part of a cross-device or household-level identification, matching, or audience-segmentation system, including but not limited to systems that link television-derived viewing activity to activity on mobile devices, computers, or other connected devices.

**California ACR Subclass:**

All natural persons in California who, during the Class Period, used an LG Smart TV on which ACR technology was enabled and that captured, analyzed, or transmitted information regarding audiovisual content displayed on the device.

**California Identity Graph Subclass:**

All natural persons in California whose viewing activity on an LG Smart TV was used by Defendants, directly or through their partners, to associate that television with one or more other devices, identifiers, or datasets as part of a cross-device or household-level identification, matching, or audience-segmentation system, including but not limited to systems that link

television-derived viewing activity to activity on mobile devices, computers, or other connected devices.

234. The Nationwide ACR Class and the Nationwide Identity Graph Class are collectively referred to as the "**Nationwide Classes**," and the California ACR Class and the California Identity Graph Class are collectively referred to as the "**California Subclasses**." The Nationwide Classes and California Subclasses are collectively referred to herein as the "**Class**."

235. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendants and their parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

236. Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

237. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 100,000 individuals that have been impacted by Defendants' actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendants.

238. **Commonality.** Common questions of law and fact arise from Defendants' uniform conduct and are capable of classwide resolution. These common questions predominate over any questions affecting only individual Class Members and include, without limitation:

a) Whether Defendants' ACR-enabled collection, interception, and disclosure of Sensitive Information occurred in a substantially similar manner for all Class Members;

b) Whether LG collected, and Alphonso received, transmitted, and/or processed, Class Members' Sensitive Information—including video-viewing activity and associated identifiers—without adequate notice or consent;

c) Whether Defendants' disclosures, if any, regarding their data collection and

sharing practices were misleading, incomplete, or insufficient to obtain informed consent;

d) Whether Defendants and their partners used persistent identifiers to link Class Members' viewing activity across devices and to create cross-device identity linkages or profiles;

e) Whether LG had a duty to refrain from capturing and transmitting, and Alphonso had a duty to refrain from receiving and using, Class Members' Sensitive Information without authorization;

f) Whether Defendants' conduct constitutes an unlawful interception, disclosure, or use of Sensitive Information under the statutes asserted herein, including but not limited to the Video Privacy Protection Act and the California Invasion of Privacy Act;

g) Whether the information disclosed by Defendants constitutes "personally identifiable information" or otherwise protected information under applicable law;

h) Whether Defendants' conduct was unfair, unlawful, or deceptive;

i) Whether Defendants were unjustly enriched by their collection and monetization of Class Members' Sensitive Information;

j) Whether Class Members suffered injury, including invasion of privacy and loss of control over their Sensitive Information, as a result of Defendants' conduct;

k) Whether Defendants' conduct entitles Plaintiffs and Class Members to statutory, actual, nominal, and/or punitive damages; and

l) Whether injunctive or declaratory relief is warranted to prevent Defendants' ongoing collection, use, and disclosure of Class Members' Sensitive Information.

239. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Information, like that of every other Class Member, was compromised as a result of Defendants' incorporation and use of the ACR Tools.

240. **Adequacy**. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the

damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

241. **Predominance**. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including third parties, in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

242. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

243. Defendants acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

244. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiffs and the Class to refrain from collecting, intercepting, transmitting, receiving, or otherwise using their Sensitive Information without authorization or informed consent;

b) Whether LG breached a legal duty to Plaintiffs and Class Members by capturing and transmitting their Sensitive Information, and whether Alphonso breached a legal duty by receiving, processing, and using that information;

c) Whether Defendants failed to comply with applicable laws, regulations, and industry standards relating to the collection, use, and disclosure of Sensitive Information;

d) Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Sensitive Information would be collected and disclosed to third parties, including Alphonso;

e) Whether Defendants failed to implement and maintain reasonable procedures and practices appropriate to the nature and scope of the Sensitive Information collected, transmitted, received, and disclosed; and

f) Whether Class Members are entitled to statutory, actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendants' wrongful conduct.

245. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

## XV. TOLLING AND ESTOPPEL

246. Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment of the incorporation and operation of ACR technology and related data-collection and transmission systems on LG Smart TVs.

247. The ACR systems on LG Smart TVs were and are invisible to the average user and operate without any contemporaneous indication that audio or video content is being captured, analyzed, or transmitted, including because Defendants' conduct occurs at the device and server level and is not observable through ordinary use of the television.

248. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendants' unlawful conduct, including the capture, identification, and disclosure of their viewing activity to third parties such as Alphonso.

249. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

250. Defendants had exclusive knowledge that LG Smart TVs incorporated ACR technology and were configured to capture, process, and transmit content-derived data and associated identifiers to third parties, including Alphonso, yet failed to adequately disclose these practices to users, including Plaintiffs and Class Members.

251. Defendants further concealed the nature, scope, and consequences of these practices through misleading terminology, fragmented disclosures, and deceptive interface design, including the use of labels such as "Viewing Information Agreement," the bundling of multiple agreements during setup, and the presentation of such disclosures in a manner that obscured their significance.

252. Under these circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of their collection, use, and disclosure of users' Sensitive Information. To date, Defendants have not fully disclosed or acknowledged the extent to which they captured, identified, and transmitted users' viewing activity and associated identifiers to third parties such as Alphonso.

253. Accordingly, Defendants are estopped from relying on any statute of limitations.

254. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

255. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendants' conduct would have been in April 2026 shortly before the filing of this Class Action Complaint.

256. Although prior reports suggested that certain smart televisions collected viewing data, those disclosures did not reveal the nature, scope, or recipients of Defendants' ACR-based

interceptions. Defendants did not disclose that their televisions captured content displayed across all inputs—including HDMI-connected devices—or that such information was transmitted in near real time to third parties such as Alphonso. These transmissions occurred through hidden background processes not visible to users and were only recently uncovered through forensic network analysis by independent researchers. As a result, Plaintiffs and Class Members could not reasonably have discovered Defendants' unlawful conduct earlier through the exercise of reasonable diligence.

257. Defendants may contend that Plaintiffs were on inquiry notice based on a September 2024 academic study describing Automatic Content Recognition ("ACR") practices in certain smart televisions. That argument fails. The study was published in a highly technical academic repository and written for a specialized audience, requiring sophisticated network-analysis tools and expertise to replicate or even understand its findings. It was not disseminated to consumers, widely reported in mainstream media, or presented in a manner that would reasonably alert an ordinary user that their television was intercepting and transmitting the contents of their video viewing to third parties. Moreover, even that study did not purport to disclose Defendants' full conduct as alleged here, including the specific scope, persistence, and commercial use of the intercepted data, nor did it provide consumers with any practical means to detect or prevent such transmissions. Under these circumstances, Plaintiffs and Class Members—acting as reasonable consumers—could not have discovered Defendants' unlawful practices through the exercise of reasonable diligence based on that publication.

## XVI. CLAIMS FOR RELIEF

### COUNT I

### Invasion of Privacy – Intrusion Upon Seclusion

(Against ***All Defendants*** on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

258. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

259. Plaintiffs bring this claim under California common law.

260. At all relevant times, Plaintiffs and members of the Class had a reasonable expectation of privacy in their homes and in the audiovisual content they viewed on their televisions.

261. The home is among the most private of spaces, and activities occurring within the home—including television viewing—are traditionally understood to be private.

262. Defendant LG, through its Smart TVs and embedded ACR technology, intentionally intruded upon Plaintiffs' and Class Members' private affairs.

263. Specifically, LG's Smart TVs monitored what appeared on the television screen by capturing audio and visual information from content displayed on the device.

264. This monitoring occurred in near real time and operated continuously or at frequent intervals during use of the television.

265. LG's ACR system captured information reflecting Plaintiffs' viewing behavior, including the programs watched, the applications used, and the content displayed through external devices connected via HDMI.

266. This surveillance extended to content viewed through streaming services, broadcast television, and third-party devices such as gaming consoles, streaming boxes, and computers.

267. By capturing and analyzing this information, LG intruded into Plaintiffs' private viewing activity within the home.

268. LG's conduct enabled the creation of detailed profiles of Plaintiffs' interests, habits, and personal characteristics based on viewing behavior.

269. These profiles included Sensitive Information reflecting Plaintiffs' preferences, beliefs, and lifestyle.

270. LG's intrusion was intentional and systematic.

271. LG designed, implemented, and deployed ACR technology for the purpose of collecting and monetizing consumer viewing data, including by transmitting content-derived data and associated identifiers to third parties such as Alphonso.

272. LG's surveillance was not incidental to the operation of the television but was instead a core component of its data collection and advertising strategy.

273. Defendant Alphonso independently and intentionally intruded upon Plaintiffs' and Class Members' private affairs by participating in the contemporaneous receipt, processing, and analysis of ACR-derived viewing data captured from LG Smart TVs. Alphonso's systems were integrated with LG's ACR functionality such that viewing data and associated identifiers were transmitted to Alphonso in near real time as users watched content.

274. Alphonso used this data to identify the specific audiovisual content being viewed—including programs, episodes, advertisements, and other on-screen material—regardless of whether that content originated from streaming applications, broadcast signals, or HDMI-connected external devices. This content recognition occurred within seconds of display and operated continuously or at frequent intervals during device use, enabling Alphonso to track Plaintiffs' viewing activity as it occurred.

275. In connection with this conduct, Alphonso received and processed persistent identifiers associated with Plaintiffs' device and household, including device identifiers, IP addresses, and other unique or quasi-unique signals. Alphonso used these identifiers, together with additional data obtained from third-party partners, to associate Plaintiffs' Smart TV activity with other devices and identities.

276. Through these practices, Alphonso constructed and maintained identity-resolution systems—commonly referred to as identity graphs—that linked Plaintiffs' television, mobile devices, computers, and other connected devices to a unified profile representing Plaintiffs or Plaintiffs' household.

277. Alphonso's identity graph and related systems enabled it to combine ACR-derived viewing data with other datasets, including advertising identifiers and partner-provided information, to generate detailed, cross-device profiles reflecting Plaintiffs' viewing habits, preferences, and personal characteristics.

278. Through this aggregation and profiling, Alphonso was able to infer sensitive attributes about Plaintiffs and Class Members, including their interests, beliefs, and lifestyle, and to associate those attributes with identifiable individuals and devices.

279. Alphonso used these profiles to create audience segments, enable targeted advertising, and facilitate cross-device tracking across televisions, mobile devices, and computers. Alphonso further disclosed or made this information available to advertisers, data brokers, and other third parties for commercial purposes.

280. This conduct—intercepting and analyzing Plaintiffs' private viewing activity in real time, linking that activity to persistent identifiers, constructing cross-device identity profiles, and disseminating those profiles within the advertising ecosystem—constitutes a separate and independently actionable intrusion into Plaintiffs' and Class Members' private affairs.

281. Plaintiffs and members of the Class did not consent to Defendants' intrusion.

282. Any purported consent obtained by LG was invalid because it was not informed, explicit, or meaningful.

283. LG obscured the nature of its surveillance through misleading terminology, including labeling its ACR-related functionality as part of a "Viewing Information Agreement," which did not disclose that the feature enabled continuous monitoring of on-screen content.

284. LG further presented disclosures during a forced, multi-step setup process that pressured consumers to accept multiple agreements in order to use Smart TV functionality.

285. LG's own instructional materials directed users to select all available agreements and proceed by pressing "Agree," reinforcing that acceptance was required to complete setup.

286. LG's disclosures failed to clearly inform users that LG would capture and analyze the content displayed on their televisions.

287. LG also failed to disclose that such information would be transmitted to third parties, including Alphonso, and used for real-time content recognition, identity resolution, profiling, and data monetization purposes.

288. Even where settings existed to disable ACR functionality, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

289. LG's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

290. Moreover, Defendants' surveillance intruded upon the privacy of individuals who never interacted with LG's disclosures or consent mechanisms, including other household members and guests.

291. Defendants' intrusion into Plaintiffs' private affairs would be highly offensive to a reasonable person.

292. A reasonable consumer would not expect that a television—and third-party data analytics company operating in conjunction with it—would capture, analyze, and transmit the content displayed on its screen in real time for the purpose of identity profiling and targeted advertising.

293. Defendants' conduct therefore constitutes an intentional intrusion upon the solitude and seclusion of Plaintiffs and members of the Class.

294. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and related damages.

295. Plaintiffs and members of the Class are entitled to all available legal and equitable remedies, including compensatory damages, injunctive relief, and any other relief deemed appropriate by the Court.

**COUNT II**

**Invasion of Privacy – Public Disclosure of Private Facts**

(Against ***All Defendants*** on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

296. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

297. Plaintiffs bring this claim under California common law.

298. At all relevant times, Plaintiffs and members of the Class had a reasonable expectation that their television viewing activity and related information would remain private.

299. Defendant LG, through its Smart TVs and embedded ACR technology, collected private information concerning Plaintiffs' viewing behavior and disclosed that information to third parties, including Defendant Alphonso.

300. Specifically, LG collected detailed information about the audiovisual content displayed on Plaintiffs' television, including the programs watched, the timing and duration of viewing sessions, and the sources of such content.

301. This information also included content viewed through third-party applications, broadcast signals, and external devices connected via HDMI.

302. The viewing information collected by LG constituted private facts because it reflected Plaintiffs' personal interests, habits, and preferences.

303. Such viewing activity is inherently private and is not ordinarily exposed to the public.

304. LG disclosed this private information to third parties, including Alphonso and other advertisers, analytics providers, and commercial entities.

305. Alphonso received Plaintiffs' viewing data and associated identifiers in near real time and used that information to identify the specific audiovisual content viewed by Plaintiffs, including programs, advertisements, and other on-screen material.

306. In connection with this conduct, Alphonso associated Plaintiffs' viewing activity with persistent identifiers, including device identifiers, IP addresses, and other signals, and combined that information with data obtained from third-party partners and data providers.

307. Through these processes, Alphonso constructed and maintained cross-device and household-level identity profiles that linked Plaintiffs' Smart TV viewing activity to other devices, identities, and datasets.

308. Alphonso used these profiles to generate audience segments and other commercially valuable datasets reflecting Plaintiffs' viewing habits, interests, and inferred characteristics.

309. Alphonso further disclosed, sold, licensed, or otherwise made available Plaintiffs' viewing information and derived profiles to advertisers, data brokers, and other third parties within the advertising and data ecosystem.

310. These disclosures were not limited to a small or confidential group but instead were made to multiple entities for commercial exploitation, including entities with no direct relationship to Plaintiffs.

311. Through these disclosures, Plaintiffs' private viewing information was disseminated beyond LG and Alphonso and into a broad, networked ecosystem of advertising, analytics, and data brokerage companies.

312. By transforming Plaintiffs' private viewing activity into identifiable, cross-device profiles and distributing that information to numerous third parties, Defendants caused Plaintiffs' private facts to be publicly disclosed within the meaning of California law.

313. Defendants' disclosures were made without Plaintiffs' consent.

314. Any purported consent obtained by LG was invalid because it was not informed, explicit, or meaningful.

315. LG obscured the nature of its data collection and disclosure practices through misleading terminology, including labeling its ACR-related functionality as part of a "Viewing Information Agreement."

316. LG further presented disclosures during a forced, multi-step setup process that pressured consumers to accept multiple agreements in order to use Smart TV functionality.

317. LG's own instructional materials directed users to select all agreements and proceed by pressing "Agree," reinforcing that acceptance was required.

318. LG's disclosures failed to clearly inform users that their viewing information would be disclosed to third parties, including Alphonso, or that such information would be used to construct identity-linked profiles and disseminated within the advertising ecosystem.

319. LG also failed to adequately disclose the scope, nature, and downstream uses of the information being disclosed.

320. Even where settings existed to limit data sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

321. LG's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

322. The private facts disclosed by Defendants would be highly offensive and objectionable to a reasonable person.

323. A reasonable consumer would not expect that a television manufacturer and its data analytics partners would capture, identify, and disseminate detailed information about their in-home viewing habits across a network of third parties for profiling and advertising purposes.

324. The disclosure of such information exposes intimate details about an individual's interests, beliefs, and lifestyle.

325. Defendants' conduct therefore constitutes a public disclosure of private facts.

326. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and related damages.

327. Plaintiffs and members of the Class are entitled to all available legal and equitable remedies, including compensatory damages, injunctive relief, and any other relief deemed appropriate by the Court.

**COUNT III**

**Invasion of Privacy – Violation of the California Constitution (Art. I, § 1)**

(Against ***All Defendants*** on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

328. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

329. Plaintiffs bring this claim under Article I, Section 1 of the California Constitution, which guarantees a right to privacy.

330. The California Constitution protects individuals against the invasion of their privacy by private entities, including the unauthorized collection, use, and disclosure of personal information.

331. To establish a violation of the constitutional right to privacy, a plaintiff must show: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) a serious invasion of privacy.

332. Plaintiffs and members of the Class possessed legally protected privacy interests in their personal information, including their television viewing activity and related audiovisual data.

333. Plaintiffs' viewing behavior, including the content watched, the timing and duration of viewing sessions, and the sources of such content, constituted sensitive personal information.

334. This information revealed details about Plaintiffs' interests, habits, preferences, and personal characteristics.

335. Plaintiffs and members of the Class had a reasonable expectation that their television viewing activity within their homes would remain private.

336. The home is among the most private of spaces, and activities occurring within the home—including television viewing—are traditionally understood to be private.

337. Defendants violated Plaintiffs' reasonable expectation of privacy by collecting, analyzing, transmitting, and monetizing Plaintiffs' viewing data through LG Smart TVs and Alphonso's integrated data-processing and identity-resolution systems.

338. Specifically, LG's ACR system captured audio and visual information from content displayed on the television screen in near real time.

339. This capture occurred continuously or at frequent intervals during use of the television and operated independently of the source of the content.

340. LG's surveillance extended to content viewed through streaming applications, broadcast television, and external devices connected via HDMI.

341. LG thereby monitored Plaintiffs' viewing activity across all inputs and sources.

342. LG used the information obtained through this surveillance to generate or facilitate the creation of detailed profiles of Plaintiffs' viewing habits and preferences and transmitted content-derived data and associated identifiers to Alphonso.

343. Alphonso received ACR-derived viewing data and associated identifiers in near real time and used that information to identify the specific audiovisual content viewed by Plaintiffs, including programs, advertisements, and other on-screen material, within seconds of display.

344. Alphonso associated this viewing data with persistent identifiers, including device identifiers, IP addresses, and other signals, and combined that information with additional data obtained from third-party partners and data providers.

345. Through these processes, Alphonso constructed and maintained cross-device and household-level identity graphs that linked Plaintiffs' Smart TV viewing activity to other devices, identities, and datasets associated with Plaintiffs or Plaintiffs' households.

346. Alphonso used these identity graphs to generate detailed profiles reflecting Plaintiffs' viewing habits, preferences, and inferred personal characteristics, and to enable targeted advertising, audience segmentation, and cross-device tracking.

347. Alphonso further disclosed, licensed, or otherwise made available such information and derived profiles to advertisers, data brokers, and other third parties within the advertising and data ecosystem.

348. Defendants' conduct constituted a serious invasion of Plaintiffs' privacy.

349. The scope, duration, and nature of Defendants' surveillance—including the continuous capture of audiovisual content within the home, the real-time identification of that content, and the transformation of that information into identifiable, cross-device profiles disseminated to third parties—were highly intrusive.

350. Defendants' conduct enabled the collection, aggregation, and widespread dissemination of detailed and sensitive information about Plaintiffs' private life.

351. Plaintiffs and members of the Class did not consent to Defendants' collection, use, or disclosure of their viewing data.

352. Any purported consent obtained by LG was invalid because it was not informed, explicit, or meaningful.

353. LG obscured the nature of its surveillance through misleading terminology, including presenting ACR-related functionality as part of a "Viewing Information Agreement," which did not disclose that the feature enabled monitoring and analysis of on-screen content.

354. LG further presented disclosures during a forced, multi-step setup process that pressured consumers to accept multiple agreements in order to use Smart TV functionality.

355. LG's own instructional materials directed users to select all available agreements and proceed by pressing "Agree," reinforcing that acceptance was required.

356. LG's disclosures failed to clearly inform users that Defendants would collect, analyze, and share detailed viewing information with third parties, including Alphonso.

357. LG also failed to disclose the full scope and purpose of its data collection and sharing practices, including real-time content recognition, identity resolution, downstream profiling, and cross-device tracking.

358. Even where settings existed to limit data collection or sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

359. LG's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

360. Moreover, Defendants' surveillance affected individuals who never interacted with LG's disclosures or consent mechanisms, including other household members and guests.

361. Defendants' conduct therefore violated Plaintiffs' right to privacy under the California Constitution.

362. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and related damages.

363. Plaintiffs and members of the Class are entitled to all available legal and equitable remedies, including injunctive relief and any other relief deemed appropriate by the Court.

**COUNT IV**

**Violation of the California Invasion of Privacy Act (CIPA), Cal. Penal Code § 631**

(Against ***All Defendants*** on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

364. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

365. CIPA § 631 prohibits any person who by means of any "machine, instrument, contrivance" or in "any other manner:" (1) intentionally taps or makes an unauthorized connection with "any telegraph or telephone wire, line, cable, or instrument;" (2) willfully and without consent of "all parties to the communication" or in "any unauthorized manner" reads or "attempts to read" or "learn[s] the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within" California; (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way" information so obtained; or (4) from aiding, agreeing, employing, or conspiring with "any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

366. Defendants are persons under CIPA § 631.

367. At all relevant times, Plaintiffs and members of the Class used LG Smart TVs to access and display audiovisual content transmitted over the internet and other communication networks while in California.

368. These transmissions—including streaming video content, application data, and audiovisual signals delivered through HDMI-connected devices—constituted "communications" within the meaning of CIPA.

369. Defendants LG and Alphonso, through their integrated ACR and data-processing systems, intentionally intercepted, endeavored to intercept, and acquired the contents of Plaintiffs' communications while those communications were in transit.

370. Specifically, LG deployed ACR technologies within its Smart TVs that captured audio and visual information from content displayed on the television screen in near real time or at frequent intervals.

371. This content-derived data and associated identifiers were transmitted to Alphonso contemporaneously with capture, as users viewed content on their televisions.

372. Alphonso participated directly in the interception process by receiving, processing, and analyzing these data streams in near real time to identify the specific audiovisual content being viewed, including programs, videos, and advertisements.

373. This interception occurred while the communications were in transit and before they reached a completed and static form.

374. By capturing fragments of audiovisual output and converting them into content-recognition fingerprints, Defendants acquired the contents and meaning of Plaintiffs' communications.

375. Alphonso was not a party to the communications at issue. The communications at issue were between Plaintiffs and the content providers, applications, broadcasters, or external devices delivering audiovisual content to Plaintiffs' Smart TV. Alphonso was an undisclosed third-party entity that intercepted and acquired those communications for its own independent commercial purposes.

376. Alphonso's interception was therefore not exempt under CIPA's party exception.

377. LG also aided, agreed with, employed, and conspired with Alphonso to intercept, read, and learn the contents of Plaintiffs' communications in violation of Cal. Penal Code § 631(a).

378. LG provided the hardware, software environment, system-level permissions, and data transmission pathways necessary for Alphonso's interception to occur.

379. LG configured its Smart TVs to permit and facilitate these interception technologies across all inputs, including:

- content streamed through third-party applications;
- cable and broadcast television signals; and
- content from external devices such as streaming boxes, gaming consoles, and computers connected via HDMI.

380. As a result, Defendants intercepted communications that occurred entirely outside of LG's own services or platforms.

381. Defendants' conduct was not necessary to provide the core functionality of the television and instead served Defendants' commercial interests in data collection, analytics, identity resolution, and targeted advertising.

382. Plaintiffs and members of the Class did not consent to the interception of their communications.

383. Any purported consent obtained by LG was invalid because it was not informed, explicit, or meaningful.

384. LG obscured the nature of its ACR surveillance through misleading terminology, including presenting ACR-related functionality as part of a "Viewing Information Agreement," which did not disclose that the feature enabled real-time monitoring and analysis of on-screen content.

385. LG further presented its disclosures during a forced, multi-step setup process that pressured consumers to accept multiple agreements in order to use Smart TV functionality.

386. LG's own instructional materials directed users to select all available agreements and proceed by pressing "Agree," reinforcing that acceptance was required.

387. LG's disclosures failed to clearly inform users that their audiovisual communications would be intercepted, analyzed, and used to identify the content of those communications.

388. LG also failed to disclose that such information would be transmitted to and used by third parties, including Alphonso, for profiling, advertising, and cross-device tracking purposes.

389. Even where settings existed to disable ACR functionality, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

390. LG's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

391. Moreover, Defendants' conduct resulted in the interception of communications of individuals who never interacted with LG's disclosures or consent mechanisms, including other household members and guests.

392. Because CIPA requires the consent of all parties to a communication, Defendants' interception was unlawful.

393. Plaintiffs and members of the Class had a reasonable expectation that their viewing activity—including the audiovisual content displayed on their televisions—would not be intercepted or monitored by third parties.

394. Defendants' conduct constitutes an egregious invasion of privacy and a violation of California law.

395. As a direct and proximate result of Defendants' violations of CIPA, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

396. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and members of the Class seek statutory damages, injunctive relief, and all other relief available under the law.

**COUNT V**

**Violation of the California Invasion of Privacy Act (CIPA), Cal. Penal Code § 632**

(Against ***All Defendants*** on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

397. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

398. Cal. Penal Code § 632 prohibits any person, without the consent of all parties to a confidential communication, from intentionally eavesdropping upon or recording the confidential communication by means of any electronic amplifying or recording device.

399. At all relevant times, Plaintiffs and members of the Class engaged in communications through their use of LG Smart TVs, including audiovisual transmissions delivered through streaming applications, broadcast signals, and external devices connected via HDMI.

400. These transmissions included audio and audiovisual communications transmitted to and from Plaintiffs' television through internet and other communication networks.

401. The communications at issue were "confidential communications" within the meaning of Cal. Penal Code § 632 because they were made under circumstances reasonably indicating that the parties to the communications—Plaintiffs and the content providers, applications, broadcasters, or connected devices—intended that the contents of those communications would remain private and not be overheard or recorded by third parties.

402. These communications occurred within Plaintiffs' home, a setting in which privacy expectations are at their highest, and reflected Plaintiffs' personal viewing choices, habits, and preferences, which are not ordinarily exposed to the public.

403. Defendant LG, through its Smart TVs and embedded ACR technology, intentionally enabled, participated in, and caused the eavesdropping upon and recording of Plaintiffs' confidential communications.

404. Defendant Alphonso independently and intentionally eavesdropped upon and recorded Plaintiffs' confidential communications by receiving, processing, and analyzing audio and audiovisual data derived from LG Smart TVs in near real time as such communications occurred.

405. Specifically, LG integrated and deployed ACR and related technologies within its Smart TVs that captured audio and audiovisual information from content displayed on the television screen in near real time or at frequent intervals.

406. This captured information—including fragments of audio and visual content—was transmitted to Alphonso contemporaneously with capture, as Plaintiffs viewed content on the television.

407. Alphonso used these data streams to identify the specific audiovisual content being viewed, including programs, advertisements, and other on-screen material, and thereby learned the contents and meaning of Plaintiffs' communications.

408. In doing so, Alphonso functioned as an electronic recording and eavesdropping device, capturing, storing, and analyzing Plaintiffs' confidential communications without Plaintiffs' knowledge or consent.

409. This recording and acquisition occurred contemporaneously with the transmission and playback of audiovisual content and was not limited to data after the communication had concluded.

410. Alphonso was not a party to the communications at issue. The communications were between Plaintiffs and content providers, applications, broadcasters, or connected devices. Alphonso was an undisclosed third-party entity that intercepted, recorded, and analyzed those communications for its own independent commercial purposes.

411. LG knowingly aided, agreed with, employed, and conspired with Alphonso to eavesdrop upon and record Plaintiffs' confidential communications in violation of Cal. Penal Code § 632.

412. LG provided the hardware, software environment, system-level permissions, persistent identifiers, and data transmission pathways necessary for Alphonso's recording and analysis to occur.

413. LG configured its Smart TVs to permit and facilitate the operation of these recording and eavesdropping technologies across all inputs, including:

- content streamed through third-party applications;
- cable and broadcast television signals; and
- content from external devices such as streaming boxes, gaming consoles, and computers connected via HDMI, as well as other personal devices connected over Wi-Fi internet, such as computers, smartphones, and tablets.

414. As a result, Defendants recorded and analyzed communications that occurred entirely outside of LG's own services or platforms.

415. Defendants' conduct was not necessary to provide the core functionality of the television and instead served Defendants' commercial interests in data collection, analytics, identity resolution, and targeted advertising.

416. Plaintiffs and members of the Class reasonably expected that their viewing activity and the audio and audiovisual content displayed within their homes would not be recorded or monitored by undisclosed third parties.

417. Plaintiffs and members of the Class did not consent to the recording or acquisition of their confidential communications by Defendants.

418. Any purported consent obtained by LG was invalid because it was not informed, explicit, or meaningful.

419. LG obscured the nature of its ACR surveillance through misleading terminology, including presenting ACR-related functionality as part of a "Viewing Information Agreement," which did not disclose that the feature enabled monitoring, recording, and analysis of audio and audiovisual content.

420. LG further presented its disclosures during a forced, multi-step setup process that pressured consumers to accept multiple agreements in order to use Smart TV functionality.

421. LG's own instructional materials directed users to select all available agreements and proceed by pressing "Agree," reinforcing that acceptance was required.

422. LG's disclosures failed to clearly inform users that their audio and audiovisual communications would be recorded, analyzed, and used to identify the content of those communications.

423. LG also failed to disclose that such data would be transmitted to and used by third parties, including Alphonso, for profiling, advertising, and cross-device tracking purposes.

424. Even where settings existed to disable ACR functionality, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

425. LG's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

426. Moreover, Defendants' conduct resulted in the recording and analysis of communications of individuals who never interacted with LG's disclosures or consent mechanisms, including other household members and guests.

427. Because CIPA requires the consent of all parties to a communication, Defendants' recording and acquisition of Plaintiffs' communications was unlawful.

428. Defendants' conduct constitutes an egregious invasion of privacy and a violation of California law.

429. As a direct and proximate result of Defendants' violations of Cal. Penal Code § 632, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

430. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and members of the Class seek statutory damages, injunctive relief, and all other relief available under the law.

**COUNT VI**

**Violation of the California Invasion of Privacy Act (CIPA), Cal. Penal Code §§ 638.50–638.51**

(Against ***All Defendants*** on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

431. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

432. This count is brought in addition to, or alternatively, in the alternative to, Plaintiffs' claims under Cal. Penal Code §§ 631 and 632.

433. This count is not focused on the "content" of Plaintiffs' communications on the Smart TVs, but rather is focused on the dialing, routing, addressing, and/or signaling information within those communications.

434. Cal. Penal Code § 638.50 prohibits any person or entity from knowingly installing or using a pen register or trap and trace device without first obtaining a court order or authorization as required by law.

435. Cal. Penal Code § 638.51 prohibits any person or entity from installing or using a pen register or trap and trace device without the consent of the user of the service.

436. A "pen register" is defined under California law as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted.

437. A "trap and trace device" is defined as a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication.

438. At all relevant times, Plaintiffs and members of the Class used LG Smart TVs to send and receive electronic communications over the internet and other communication networks while in California.

439. These communications included, among other things:

- requests for streaming video content;
- application usage data and event signals;
- device-level communications between Smart TVs and remote servers; and
- audiovisual transmissions delivered to the television through streaming services and external devices.

440. Defendant LG, through its Smart TVs and embedded ACR and telemetry systems, knowingly installed and operated processes that functioned as pen registers and trap and trace devices.

441. Specifically, LG's systems captured, recorded, and transmitted dialing, routing, addressing, and signaling information associated with communications transmitted to and from Plaintiffs' Smart TVs.

442. This information included, among other things:

- identifiers associated with content requests, applications, and services;
- application identifiers and usage signals;
- device identifiers, IP addresses, and network-level routing information; and
- metadata reflecting how, when, and from where communications were transmitted.

443. LG's systems captured this information contemporaneously with the transmission of communications and without regard to the source of the content.

444. By capturing and processing this information, LG recorded dialing, routing, addressing, and signaling information associated with Plaintiffs' electronic communications.

445. Defendant Alphonso likewise knowingly installed, operated, and/or used processes that functioned as pen registers and trap and trace devices.

446. Alphonso received, decoded, and analyzed the signaling and identifier data generated by LG Smart TVs and used that data to identify content, devices, and users.

447. Alphonso used this dialing, routing, addressing, and signaling information to construct household-level and cross-device identity linkages and profiles, associating Smart TVs with other devices such as mobile phones, tablets, and computers.

448. Through this decoding and linkage process, Alphonso transformed signaling and identifier data into structured identity graphs and audience segments used for advertising, analytics, and cross-device tracking.

449. Alphonso's use of such processes constitutes the decoding and use of dialing, routing, addressing, and signaling information within the meaning of Cal. Penal Code §§ 638.50–638.51.

450. Defendants' conduct therefore constituted the installation and use of pen registers and trap and trace devices or processes within the meaning of Cal. Penal Code §§ 638.50–638.51.

451. Defendants installed and used these devices and processes without obtaining a court order or lawful authorization.

452. Defendants also installed and used these devices and processes without the consent of Plaintiffs and members of the Class.

453. Plaintiffs and members of the Class were not informed that Defendants would capture, decode, and use dialing, routing, addressing, and signaling information associated with their communications.

454. Any purported consent obtained by LG was invalid because it was not informed, explicit, or meaningful.

455. LG obscured the nature of its data collection through misleading terminology, including presenting ACR-related functionality as part of a "Viewing Information Agreement."

456. LG further presented disclosures during a forced, multi-step setup process that pressured consumers to accept multiple agreements in order to use Smart TV functionality.

457. LG's own instructional materials directed users to select all available agreements and proceed by pressing "Agree," reinforcing that acceptance was required.

458. LG's disclosures failed to clearly inform users that Defendants would capture and process routing, addressing, and signaling information associated with their communications or that such data would be used to construct identity-linked profiles across devices.

459. Even where settings existed to limit data collection, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

460. Defendants' consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

461. Moreover, Defendants' data collection captured communications and associated signaling information of individuals who never interacted with LG's disclosures or consent mechanisms, including other household members and guests.

462. Plaintiffs and members of the Class had a reasonable expectation that the routing, addressing, and signaling information associated with their communications would not be captured, decoded, or used to construct cross-device identity profiles.

463. Defendants' conduct constitutes an egregious invasion of privacy and a violation of California law.

464. As a direct and proximate result of Defendants' violations of Cal. Penal Code §§ 638.50–638.51, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

465. Pursuant to Cal. Penal Code § 637.2 and other applicable provisions, Plaintiffs and members of the Class seek statutory damages, injunctive relief, and all other relief available under the law.

## COUNT VII

## Violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502

(Against ***All Defendants*** on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

466. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

467. Plaintiffs bring this claim under the CDAFA, Cal. Penal Code § 502.

468. At all relevant times, Plaintiffs' LG Smart TVs constituted a "computer," "computer system," and/or "computer network" within the meaning of Cal. Penal Code § 502(b).

469. Plaintiffs and members of the Class were the owners and/or authorized users of their LG Smart TVs.

470. Defendant LG knowingly and without permission accessed, used, and caused to be used Plaintiffs' Smart TVs and related computer systems.

471. At all relevant times, Plaintiffs' LG Smart TVs constituted a "computer," "computer system," and/or "computer network" within the meaning of Cal. Penal Code § 502(b).

472. Plaintiffs and members of the Class were the owners and/or authorized users of their LG Smart TVs.

473. Defendants knowingly and without permission accessed, used, and caused to be used Plaintiffs' Smart TVs and related computer systems.

474. Specifically, LG, through its embedded ACR technology and related software processes, accessed Plaintiffs' Smart TVs to collect, extract, and transmit data regarding Plaintiffs' viewing activity.

475. LG's conduct included taking, copying, and making use of data from Plaintiffs' Smart TVs, including audiovisual content information, device-level data, and associated identifiers.

476. LG used this data for its own commercial purposes, including advertising, analytics, consumer profiling, and enabling third-party data monetization.

477. Alphonso designed, supplied, operated, and/or directed content-recognition and analytics systems that interfaced with LG Smart TVs and caused those devices to generate, structure, and transmit data reflecting users' viewing activity to Alphonso-controlled or affiliated servers.

478. Through these systems, Alphonso knowingly caused Plaintiffs' Smart TVs to be used to capture content-derived data, including audiovisual fingerprints, identifiers, and associated metadata, which were then transmitted off the device.

479. Alphonso thereby took, copied, and made use of data from Plaintiffs' Smart TVs, including data sufficient to identify specific content viewed, device characteristics, and user or household-level activity.

480. Alphonso used this data for its own commercial purposes, including content identification, audience segmentation, cross-device data linkage, targeted advertising, and analytics.

481. Defendants' conduct violated Cal. Penal Code § 502(c), including but not limited to:

- § 502(c)(1), by knowingly accessing and without permission altering, damaging, deleting, destroying, or otherwise using data and computer systems;
- § 502(c)(2), by knowingly accessing and without permission taking, copying, or making use of data from a computer, computer system, or computer network;
- § 502(c)(3), by knowingly and without permission using or causing to be used computer services; and
- § 502(c)(7), by knowingly accessing or causing to be accessed any computer, computer system, or computer network without permission.

482. Defendants' access to Plaintiffs' Smart TV and associated data was without permission because Plaintiffs' did not authorize Defendants to collect, extract, analyze, or

monetize detailed information about the audiovisual content displayed on the device or to transmit such information to third parties.

483. Any purported authorization obtained by LG was invalid because it was not informed, explicit, or meaningful.

484. LG obscured the nature of its data access and collection practices through misleading terminology, including presenting ACR-related functionality as part of a "Viewing Information Agreement."

485. LG further presented disclosures during a forced, multi-step setup process that pressured consumers to accept multiple agreements in order to use Smart TV functionality.

486. LG's own instructional materials directed users to select all available agreements and proceed by pressing "Agree," reinforcing that acceptance was required.

487. LG's disclosures failed to clearly inform users that Defendants would access and extract detailed viewing information from their devices.

488. LG also failed to disclose that such data would be used for advertising, analytics, and profiling purposes and shared with third parties, including Alphonso.

489. Even where settings existed to limit data collection, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

490. Defendants' consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

491. Moreover, Defendants' conduct resulted in the access and use of data associated with individuals who never interacted with LG's disclosures or consent mechanisms, including other household members and guests.

492. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class suffered damage and loss within the meaning of Cal. Penal Code § 502(e), including but not limited to:

- unauthorized use of their devices and data;
- misappropriation of valuable personal information; and

- loss of control over their data.

493. Defendants' conduct was knowing, intentional, and wrongful.

494. Pursuant to Cal. Penal Code § 502(e) and (e)(1), Plaintiffs and members of the Class seek compensatory damages, injunctive relief, and all other relief available under the law.

**COUNT VIII**

**Violation of the Federal Wiretap Act (as amended by the Electronic Communications Privacy Act or "ECPA"), 18 U.S.C. § 2510, et seq.**

(Against ***All Defendants*** on Behalf of Plaintiffs and the Nationwide Classes)

495. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

496. Plaintiffs bring this claim under the Federal Wiretap Act, 18 U.S.C. § 2510, et seq.

497. The Federal Wiretap Act prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept any wire, oral, or electronic communication, as well as from using or disclosing the contents of such communications without consent.

498. At all relevant times, Plaintiffs and members of the Nationwide Class transmitted and received electronic communications through their use of LG Smart TVs.

499. These communications included, among other things, streaming video content, audiovisual transmissions, application data, and communications between Plaintiffs' Smart TVs and remote servers.

500. These transmissions constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

501. Defendant Alphonso intentionally intercepted, endeavored to intercept, and acquired the contents of Plaintiffs' electronic communications.

502. Specifically, Alphonso received and processed content-derived data generated by LG Smart TVs, including audiovisual fingerprints and associated identifiers, which enabled Alphonso to identify the specific content being viewed.

503. This acquisition occurred contemporaneously with the transmission and display of the communications.

504. By receiving and processing these data streams to identify underlying audiovisual content, Alphonso acquired the contents and meaning of Plaintiffs' electronic communications.

505. Alphonso is not a party to the communications at issue. The communications at issue were between Plaintiffs and the content providers, applications, or devices delivering audiovisual content to Plaintiffs' Smart TVs. Alphonso was an undisclosed third-party recipient that intercepted and acquired those communications.

506. Defendant LG likewise intentionally intercepted, endeavored to intercept, and procured the interception of Plaintiffs' communications.

507. Specifically, LG integrated and deployed ACR technology and related systems within its Smart TVs that captured audio and/or visual information from content displayed on Plaintiffs' television screen in near real time or at frequent intervals.

508. LG's systems enabled and caused Alphonso to intercept and acquire the contents of Plaintiffs' communications.

509. LG's interception and procurement occurred while the communications were in transit, and before they reached their intended destination in a completed and static form.

510. LG's ACR system captured communications across all inputs, including:

- content streamed through third-party applications;
- cable and broadcast television signals; and
- content from external devices such as streaming boxes, gaming consoles, and computers connected via HDMI.

511. As a result, Defendants intercepted communications that occurred entirely outside of LG's own services or platforms.

512. Defendants used and disclosed the contents of these communications for commercial purposes, including advertising, analytics, profiling, and cross-device data linkage.

513. Defendants' conduct was intentional.

514. Plaintiffs and members of the Nationwide Class did not consent to Defendants' interception, use, or disclosure of their communications.

515. Any purported consent obtained by LG was invalid because it was not informed, explicit, or meaningful.

516. Alphonso, as a non-party to the communications, is not entitled to any "party" exception under the Federal Wiretap Act.

517. Even if LG or Alphonso were deemed a party to any of the intercepted communications, the statutory exception set forth in 18 U.S.C. § 2511(2)(d) does not apply because LG and Alphonso intercepted such communications for the purpose of committing tortious and unlawful acts.

518. Specifically, Defendants intercepted Plaintiffs' communications in order to collect, analyze, monetize, and disclose detailed information regarding Plaintiffs' viewing activity without authorization.

519. Defendants' interception was undertaken for the purpose of committing, and in furtherance of committing, multiple independent torts and statutory violations, including:

- invasion of privacy – intrusion upon seclusion;
- invasion of privacy – public disclosure of private facts;
- invasion of privacy in violation of the California Constitution;
- violations of the California Invasion of Privacy Act (Cal. Penal Code §§ 631, 632, and 638.50–638.51);
- violations of the Video Privacy Protection Act (18 U.S.C. § 2710);
- violations of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200); and
- unjust enrichment and other unlawful business practices.

520. Defendants' interception of communications was therefore carried out for a tortious and unlawful purpose within the meaning of 18 U.S.C. § 2511(2)(d).

521. Accordingly, any purported consent—whether actual, implied, or constructive—does not shield Defendants from liability under the Federal Wiretap Act.

522. LG's disclosures further obscured the nature of its surveillance through misleading terminology, including presenting ACR-related functionality as part of a "Viewing Information Agreement."

523. LG presented disclosures during a forced, multi-step setup process that pressured consumers to accept multiple agreements in order to use the television and failed to clearly inform users that Defendants would intercept, analyze, and monetize the content of their communications.

524. Defendants' conduct therefore was not authorized by law and does not fall within any statutory exception.

525. As a direct and proximate result of Defendants' violations of the Federal Wiretap Act, Plaintiffs and members of the Nationwide Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

526. Pursuant to 18 U.S.C. § 2520, Plaintiffs and members of the Nationwide Class seek statutory damages, punitive damages, injunctive relief, and all other relief available under the law.

**COUNT IX**

**Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710**

(Against ***only*** ***Defendant LG*** on Behalf of Plaintiffs and the Nationwide Classes)

527. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

528. Plaintiffs bring this claim under the VPPA, 18 U.S.C. § 2710.

529. The VPPA prohibits a "video tape service provider" from knowingly disclosing to any person personally identifiable information concerning a consumer's request for or obtaining of specific video materials or services, without the informed, written consent of the consumer.

530. Defendant LG was, and is, a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4), because it engaged in the business of delivering, providing, and facilitating

access to audiovisual content and video programming through its Smart TVs and integrated software platforms.

531. Plaintiffs were "consumers" within the meaning of 18 U.S.C. § 2710(a)(1), as Plaintiffs used LG's Smart TV services to obtain video content.

532. Defendant LG knowingly disclosed to third parties personally identifiable information ("PII") concerning Plaintiffs' requests for and viewing of specific video materials and services.

533. Specifically, LG collected and disclosed detailed information about the audiovisual content displayed on Plaintiffs' television, including the programs watched, the timing and duration of viewing sessions, and the sources of such content.

534. This information included content viewed through streaming applications, broadcast signals, and external devices connected via HDMI.

535. LG disclosed this viewing information to third parties, including advertisers, analytics providers, and other commercial entities.

536. LG disclosed Plaintiffs' viewing data in conjunction with persistent identifiers and other information that allowed third parties to identify Plaintiffs and/or Plaintiffs' household.

537. These identifiers included, among other things, device identifiers, network identifiers, IP addresses, and other unique identifiers associated with Plaintiffs' Smart TV.

538. By linking viewing information with such identifiers, LG disclosed information that identified Plaintiffs as having requested or obtained specific video materials or services.

539. The information disclosed by LG therefore constituted "personally identifiable information" within the meaning of the VPPA.

540. LG made these disclosures knowingly.

541. Plaintiffs did not provide informed, written consent to LG's disclosure of Plaintiffs' personally identifiable viewing information.

542. Any purported consent obtained by LG was invalid because it was not informed, was not specific to the disclosure of video viewing information, and was not provided in a standalone written form as required by the VPPA.

543. LG obscured the nature of its data collection and disclosure practices through misleading terminology, including presenting ACR-related functionality as part of a "Viewing Information Agreement."

544. LG further presented disclosures during a forced, multi-step setup process that pressured consumers to accept multiple agreements in order to use the television.

545. LG's own instructional materials directed users to select all available agreements and proceed by pressing "Agree," reinforcing that acceptance was required.

546. LG's disclosures failed to clearly inform users that LG would disclose their video viewing information to third parties.

547. LG also failed to disclose the scope, nature, and purpose of such disclosures.

548. Even where settings existed to limit data sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

549. LG's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

550. LG's conduct constituted a violation of 18 U.S.C. § 2710(b)(1).

551. As a direct and proximate result of LG's violations of the VPPA, Plaintiffs and members of the Nationwide Class have suffered harm, including invasion of privacy and loss of control over personal information.

552. Pursuant to 18 U.S.C. § 2710(c), Plaintiffs and members of the Nationwide Class seek statutory damages, punitive damages, attorneys' fees and costs, injunctive relief, and all other relief available under the law.

**COUNT X**

**Negligence**

(Against ***All Defendants*** on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

553. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

554. Plaintiffs bring this claim under California common law.

555. At all relevant times, Defendants owed Plaintiffs and members of the Class a duty to exercise reasonable care in the design, development, integration, configuration, and operation of the Smart TV systems and related data-collection, processing, and transmission technologies at issue.

556. Defendant LG owed a duty to exercise reasonable care in the design, manufacture, configuration, and operation of its Smart TVs and embedded software systems, including ACR and related data-collection technologies.

557. Defendant Alphonso owed a duty to exercise reasonable care in the design, operation, and use of its content-recognition, data processing, and identity-resolution systems that interfaced with LG Smart TVs and processed user viewing data.

558. Defendants also owed a duty to refrain from collecting, accessing, using, analyzing, and disclosing Plaintiffs' personal information without authorization or adequate and accurate disclosure.

559. Defendants further owed a duty to implement reasonable and transparent practices to protect consumers' privacy and to avoid engaging in conduct that foreseeably invaded users' privacy interests.

560. Defendants knew or should have known that LG Smart TVs would be used within consumers' homes and would display sensitive audiovisual content reflecting users' personal interests, habits, and preferences.

561. Defendants knew or should have known that the monitoring, capture, transmission, and analysis of such content through ACR and related technologies would intrude upon users' privacy and expose Sensitive Information.

562. Defendants further knew or should have known that combining viewing data with persistent identifiers and cross-device linkage systems would enable the identification of specific individuals and households and the creation of detailed behavioral profiles.

563. Defendants breached their duties by, among other things:

- designing, deploying, and operating systems that monitored and captured audiovisual content displayed on users' televisions;
- collecting and processing detailed information about Plaintiffs' viewing activity without adequate disclosure or authorization;
- accessing, extracting, and causing to be transmitted data from Plaintiffs' Smart TV for purposes unrelated to core device functionality;
- designing and operating systems that enabled the identification of users and households based on viewing activity;
- failing to implement reasonable and transparent consent mechanisms;
- obscuring data collection and use practices through misleading terminology and interface design; and
- disclosing, receiving, and using Plaintiffs' viewing information for commercial purposes, including advertising, analytics, and profiling.

564. Defendants' conduct fell below the standard of care expected of reasonable companies operating connected consumer devices and surveillance-based advertising systems involving in-home data.

565. Defendants' actions were negligent and created a foreseeable risk of harm to Plaintiffs and members of the Class.

566. Plaintiffs and members of the Class did not consent to Defendants' conduct.

567. Any purported consent obtained by LG was invalid because it was not informed, explicit, or meaningful.

568. Defendants' conduct was a substantial factor in causing harm to Plaintiffs and members of the Class.

569. As a direct and proximate result of Defendants' negligence, Plaintiffs and members of the Class have suffered damages, including invasion of privacy, loss of control over personal information, and the unauthorized use and exploitation of their data.

570. Plaintiffs' and Class Members' Sensitive Information has independent economic value, including value in the marketplace for consumer data, advertising, and analytics.

571. Defendants' unauthorized collection, use, and disclosure of that information diminished its value by, among other things, depriving Plaintiffs and Class Members of the ability to control, exclude others from, license, or otherwise monetize their own data.

572. Defendants' conduct also resulted in the uncompensated transfer of valuable data to Defendants and their commercial partners, while stripping that data of its exclusivity and reducing its market value.

573. As a result, Plaintiffs and Class Members have suffered economic harm, including the diminution in value of their Sensitive Information.

574. Plaintiffs and members of the Class are entitled to recover damages, injunctive relief, and all other relief available under California law.

575. Defendants' conduct also violated multiple statutes enacted to protect the privacy and confidentiality of consumers' communications and personal information, including, without limitation, the California Invasion of Privacy Act (Cal. Penal Code §§ 630 et seq.), the Electronic Communications Privacy Act (18 U.S.C. § 2510 et seq.), the Video Privacy Protection Act (18 U.S.C. § 2710), and the Comprehensive Computer Data Access and Fraud Act (Cal. Penal Code § 502).

576. These statutes were designed to prevent the unauthorized collection, use, and disclosure of individuals' communications and personal information and to protect consumers such as Plaintiffs and members of the Class from precisely the type of harms alleged herein.

577. Defendants' violations of these statutes establish a presumption of negligence under California law, including California Evidence Code § 669.

**COUNT XI**

**Breach of Implied Contract**

(Against ***only*** ***Defendant LG*** on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

578. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

579. Plaintiffs bring this claim under California common law.

580. At all relevant times, Plaintiffs and Defendant LG entered into implied contracts under which LG agreed to provide Smart TVs and related services in exchange for Plaintiffs' payment and use of the device.

581. These implied contracts included an understanding that LG would not collect, access, use, or disclose Plaintiffs' personal information—including detailed viewing activity—beyond what was necessary to provide the core functionality of the Smart TV, and would do so only with adequate disclosure and authorization.

582. Plaintiffs reasonably expected that LG would not surreptitiously monitor, capture, analyze, or monetize the audiovisual content displayed on Plaintiffs' televisions.

583. Plaintiffs further reasonably expected that LG would not share or make available such information to third parties, including data analytics and advertising companies such as Alphonso, without clear and informed consent.

584. In exchange for these promises, Plaintiffs provided valuable consideration, including payment for the Smart TVs and the provision of access to data generated through use of the devices.

585. LG accepted and retained this consideration.

586. LG breached the implied contract by, among other things:

- collecting detailed information about Plaintiffs' viewing activity through ACR technology;
- monitoring audiovisual content displayed on Plaintiffs' televisions;
- accessing and extracting data from Plaintiffs' Smart TVs for purposes unrelated to core device functionality;
- using Plaintiffs' data for advertising, analytics, profiling, and cross-device tracking purposes; and
- disclosing or making available Plaintiffs' viewing information to third parties, including Alphonso.

587. LG's disclosures to Alphonso were made pursuant to an integrated data collection and monetization system in which Alphonso received, processed, and used Plaintiffs' viewing information for commercial purposes.

588. LG's conduct exceeded the scope of any reasonable expectations arising from its relationship with Plaintiffs.

589. LG did not adequately disclose these practices or obtain valid authorization from Plaintiffs.

590. Any purported consent obtained by LG was invalid because it was not informed, explicit, or meaningful.

591. LG obscured the nature of its data collection and disclosure practices through misleading terminology, including presenting ACR-related functionality as part of a "Viewing Information Agreement"—if any such agreement was presented at all.

592. LG further presented disclosures during a forced, multi-step setup process that pressured consumers to accept multiple agreements in order to use the television.

593. LG's own instructional materials directed users to select all available agreements and proceed by pressing "Agree," reinforcing that acceptance was required.

594. LG's disclosures failed to clearly inform users that LG would collect, analyze, and monetize detailed viewing information.

595. LG also failed to disclose that such information would be shared with or made available to third parties, including Alphonso, or used to construct cross-device identity profiles.

596. Even where settings existed to limit data collection or sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

597. LG's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

598. Alphonso knowingly received and used Plaintiffs' viewing information obtained through LG's breach and was a foreseeable and intended participant in the data collection and monetization practices at issue.

599. As a direct and proximate result of LG's breach, Plaintiffs and members of the Class have suffered damages, including the loss of the benefit of their bargain, the unauthorized use and exploitation of their personal information, and the diminution in value of their Sensitive Information.

600. Plaintiffs and members of the Class are entitled to recover damages and all other relief available under California law.

**COUNT XII**

**Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.**

(Against ***All Defendants*** on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

601. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

602. Plaintiffs bring this claim under California's UCL, Cal. Bus. & Prof. Code § 17200 et seq.

603. The UCL prohibits any unlawful, unfair, or fraudulent business act or practice.

604. Defendants engaged in unlawful, unfair, and fraudulent business acts and practices in connection with LG Smart TVs, embedded ACR technology, and related data collection, processing, and monetization systems.

**1. Unlawful Prong**

605. Defendants' conduct violated multiple laws, including but not limited to:

- CIPA (Cal. Penal Code §§ 631, 632, 638.50–638.51);
- CDAFA (Cal. Penal Code § 502); and
- ECPA (18 U.S.C. § 2510 et seq.).

606. These violations constitute "unlawful" business acts and practices under the UCL.

**2. Unfair Prong**

607. Defendants' conduct was unfair because it offended established public policy and was immoral, unethical, oppressive, and substantially injurious to consumers.

608. Defendants' conduct caused substantial injury to Plaintiffs and members of the Class by invading their privacy, misappropriating their personal information, and exploiting in-home viewing activity for commercial gain.

609. The harm to Plaintiffs and members of the Class outweighed any purported benefits associated with Defendants' conduct.

610. Plaintiffs and members of the Class could not reasonably have avoided the injury.

611. Defendants' surveillance and data monetization practices were not necessary to provide the core functionality of Smart TVs and instead served Defendants' commercial interests in data collection, identity resolution, and targeted advertising.

612. LG continuously monitored the content displayed on consumers' televisions, including content from streaming applications, broadcast signals, and HDMI-connected devices.

613. LG collected and transmitted detailed information about Plaintiffs' viewing activity.

614. Alphonso received, processed, analyzed, and monetized that information, including by constructing cross-device and household-level identity profiles and enabling targeted advertising and analytics.

615. Defendants' conduct therefore constituted an unfair business practice.

**3. Fraudulent Prong**

616. Defendants' conduct was fraudulent because it was likely to deceive reasonable consumers.

617. LG misrepresented and omitted material facts regarding its data collection, surveillance, and data sharing practices.

618. LG used misleading terminology, including presenting ACR-related functionality as part of a "Viewing Information Agreement," which did not disclose that the feature enabled monitoring and analysis of on-screen content.

619. LG failed to clearly disclose that it would capture, analyze, and monetize the audiovisual content displayed on consumers' televisions.

620. LG also failed to disclose that such information would be shared with or made available to third parties, including Alphonso, and used to construct identity-linked profiles.

621. LG presented disclosures during a forced, multi-step setup process that pressured consumers to accept multiple agreements in order to use the television.

622. LG's own instructional materials directed users to select all available agreements and proceed by pressing "Agree," reinforcing that acceptance was required.

623. Even where settings existed to limit data collection, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

624. Defendants' consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

625. These misrepresentations and omissions were material because a reasonable consumer would consider them important in deciding whether to purchase or use an LG Smart TV.

626. Plaintiffs and members of the Class were likely to be deceived by Defendants' conduct.

627. As a result of Defendants' unlawful, unfair, and fraudulent conduct, Plaintiffs and members of the Class suffered injury in fact and lost money or property.

628. Plaintiffs and members of the Class lost the value of their personal information, including through the diminution in value of their Sensitive Information resulting from Defendants' unauthorized collection, use, and disclosure of that information.

629. Plaintiffs and members of the Class also lost the benefit of their bargain.

630. Plaintiffs and members of the Class would not have purchased, or would have paid less for, LG Smart TVs had they known of Defendants' conduct.

631. Plaintiffs seek restitution, injunctive relief, and all other relief available under Cal. Bus. & Prof. Code § 17203.

**COUNT XIII**

**Unjust Enrichment**

(Against ***All Defendants*** on Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

632. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

633. Plaintiffs bring this claim for unjust enrichment under California law.

634. Defendants received and retained benefits at the expense of Plaintiffs and members of the Class.

635. Plaintiffs conferred benefits on Defendants, including payment for the Smart TVs and valuable data generated through Plaintiffs' use of the devices.

636. Plaintiffs' viewing activity and associated data constituted valuable information that Defendants collected, analyzed, and monetized.

637. Defendant LG knowingly accepted and retained these benefits, including through the sale of Smart TVs and the collection and transmission of user data.

638. Defendant Alphonso knowingly accepted and retained these benefits by receiving, processing, analyzing, and monetizing Plaintiffs' viewing data and associated identifiers.

639. Defendants appreciated and understood that they were receiving valuable benefits from Plaintiffs, including access to and use of Plaintiffs' personal information and in-home viewing activity.

640. Defendants obtained these benefits through their collection, transmission, receipt, and use of Plaintiffs' viewing data via LG Smart TVs and Alphonso's content-recognition, analytics, and identity-resolution systems.

641. Defendants used Plaintiffs' data for commercial purposes, including advertising, analytics, profiling, cross-device tracking, and data monetization.

642. Defendants also shared, sold, or otherwise made available this data and derived profiles to third parties, thereby further profiting from Plaintiffs' information.

643. Defendants' retention of these benefits was unjust because it was obtained through deceptive, unlawful, and unfair conduct.

644. Defendants collected and used Plaintiffs' data without valid consent.

645. Any purported consent obtained by LG was invalid because it was not informed, explicit, or meaningful.

646. LG obscured the nature of its data collection and disclosure practices through misleading terminology, including presenting ACR-related functionality as part of a "Viewing Information Agreement."

647. LG further presented disclosures during a forced, multi-step setup process that pressured consumers to accept multiple agreements in order to use the television.

648. LG's own instructional materials directed users to select all available agreements and proceed by pressing "Agree," reinforcing that acceptance was required.

649. LG's disclosures failed to clearly inform users that Defendants would collect, analyze, and monetize detailed viewing information.

650. LG also failed to disclose that such information would be shared with or made available to third parties, including Alphonso, or used to construct identity-linked profiles.

651. Even where settings existed to limit data collection or sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

652. Defendants' consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

653. Plaintiffs' and Class Members' Sensitive Information has independent economic value, including value in the marketplace for consumer data, advertising, and analytics.

654. Defendants wrongfully appropriated that value by collecting, using, and monetizing Plaintiffs' data without compensation.

655. Defendants' conduct diminished the value of Plaintiffs' and Class Members' Sensitive Information by destroying its exclusivity and depriving Plaintiffs and Class Members of the ability to control, license, or otherwise monetize their own data.

656. It would be inequitable and unjust for Defendants to retain the benefits they obtained from Plaintiffs and members of the Class.

657. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have suffered harm.

658. Plaintiffs seek restitution, disgorgement of all ill-gotten gains, and all other relief available under California law.

**COUNT XIV**

**Injunctive Relief**

(Against ***All Defendants*** on Behalf of Plaintiffs, the Nationwide Classes, or in the alternative, the California Subclasses)

659. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

660. Plaintiffs bring this claim for injunctive relief under applicable law, including but not limited to Cal. Bus. & Prof. Code § 17203, Cal. Penal Code § 637.2, 18 U.S.C. § 2520, and the Court's equitable powers.

661. Defendants have engaged in, and continue to engage in, unlawful, unfair, and deceptive acts and practices as alleged herein.

662. Defendants' conduct includes the ongoing collection, interception, capture, transmission, receipt, analysis, use, and disclosure of Plaintiffs' and Class Members' viewing data through LG Smart TVs, embedded ACR technology, and Alphonso's data-processing and identity-resolution systems.

663. Absent injunctive relief, Defendants will continue to engage in the unlawful and deceptive practices described herein.

664. Plaintiffs and members of the Class face a real and immediate threat of continued injury because LG Smart TVs remain in use and Defendants' systems continue to collect, process, and monetize viewing data.

665. Plaintiffs lack an adequate remedy at law because monetary damages alone cannot fully compensate for the ongoing invasion of privacy, the continued loss of control over personal information, and the continuing diminution in value of Plaintiffs' and Class Members' Sensitive Information.

666. Plaintiffs seeks injunctive relief requiring Defendants to, among other things:

- cease intercepting, recording, collecting, transmitting, receiving, using, and disclosing viewing data without valid, informed, and express consent;
- cease using ACR-derived data and associated identifiers to construct, maintain, or utilize cross-device or household-level identity profiles;
- implement clear, conspicuous, and truthful disclosures regarding all data collection, processing, sharing, and identity-resolution practices;
- obtain affirmative, informed, and standalone consent prior to any ACR-based data collection, transmission, or use;

- provide users with a simple, effective, and easily accessible mechanism to disable ACR functionality and associated data sharing;
- delete or permanently de-identify all previously collected viewing data and derived profiles associated with Plaintiffs and Class Members;
- cease sharing, selling, or otherwise making available such data or derived profiles to third parties; and
- refrain from using deceptive terminology, dark patterns, or manipulative interface designs in connection with their data practices.

667. The balance of equities favors granting injunctive relief because Defendants' practices harm consumers' privacy rights and provide no countervailing benefit that outweighs that harm.

668. The public interest would be served by enjoining Defendants' unlawful, unfair, and deceptive conduct.

669. Plaintiffs and members of the Class are therefore entitled to injunctive and declaratory relief as requested herein.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request the Court enter an Order:

a. Certifying the Class and appointing Plaintiffs as Class Representatives;

b. Appointing Plaintiffs' attorneys as Class Counsel;

c. Finding Defendants' conduct unlawful;

d. Awarding injunctive and other equitable relief as is just and proper;

e. Awarding Plaintiffs and the Class damages, including actual, compensatory, nominal, punitive, and other damages, in an amount to be determined at trial;

f. Awarding Plaintiffs and the Class restitution and/or disgorgement of unjust and unlawful profits,

g. Awarding pre- and post-judgment interest to the extent provided by law;

h. Awarding reasonable attorneys' fees, costs, and expenses to the extent provided by

law; and

i. Granting such other relief the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiffs demand a jury trial for all claims so triable.

Dated: April 30, 2026

Respectfully submitted,

By: *<u>/s/ Melisa A. Rosadini-Knott</u>*

**PEIFFER WOLF CARR
KANE CONWAY & WISE LLP**

Melisa A. Rosadini-Knott
(California Bar No. 316369)
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010-1923
Tel: (323) 982-4109
mrosadini@peifferwolf.com

Brandon M. Wise*
One US Bank Plaza, Suite 1950
St. Louis, MO 63101
Tel: (314) 833-4825
bwise@peifferwolf.com

Andrew R. Tate*
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
Tel: (314) 669-3600
atate@peifferwolf.com

* *pro hac vice* forthcoming

*Counsel for Plaintiffs and the Proposed Class*