Melisa A. Rosadini-Knott
mrosadini@peifferwolf.com
(California Bar No. 316369)
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE LLP**
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010-1923
323-982-4109

[Additional counsel listed on signature page]
*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEONA CAZARES, MICHAEL WALSH, and LAURA WILLIS-ALBRIGO, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>LG ELECTRONICS U.S.A., INC. and ALPHONSO INC.,<br><br>*Defendants*. | Case No.: 5:26-cv-03840-EKL<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT LG ELECTRONICS U.S.A., INC.'S MOTION TO COMPEL ARBITRATION AND STAY CASE**<br><br>Date: November 4, 2026<br>Time: 10:00 a.m.<br>Judge: Hon. Eumi K. Lee<br>Courtroom: 7<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1
II. STATEMENT OF FACTS ..... 2
  A. LG's Setup Flow Never Discloses Arbitration. ..... 2
  B. The Two Purported Arbitration Agreements. ..... 3
  C. Plaintiffs. ..... 3
  D. LG's Evidence. ..... 4
III. LEGAL STANDARD ..... 5
IV. ARGUMENT ..... 5
  A. LG Has Not Carried Its Burden to Prove Formation of Any Agreement to Arbitrate. ..... 5
    1. The Product AA fails as a matter of law under Norcia. ..... 5
    2. The TV AA fails under Berman and Herzog because LG's flow never presented it as a contract. ..... 7
    3. LG's evidence cannot establish formation as to any Plaintiff, and at a minimum a jury must resolve the disputes it creates. ..... 8
    4. Willis-Albrigo never agreed to anything, and no doctrine imputes her spouse's clicks to her. ..... 10
  B. The Court, Not an Arbitrator, Decides Enforceability and Scope. ..... 12
  C. Plaintiffs' Claims Fall Outside Both Provisions. ..... 14
    1. The TV AA's scope is keyed to a "EULA" that is not the Terms of Use. 14
    2. The challenged conduct arises under, if anything, the Viewing Information Agreement. ..... 14
    3. The Product AA does not reach non-warranty privacy claims. ..... 15
  D. If Reached, Both Provisions Are Unconscionable. ..... 15
  E. Plaintiffs' Injunctive-Relief Claims Remain in This Court Regardless. ..... 17
  F. The Court Should Decline to Stay the Non-Arbitrable Claims. ..... 17
    1. The requested stays are discretionary and unjustified. ..... 17
    2. Turing Video does not support a blanket stay here. ..... 18
V. CONCLUSION ..... 18

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*1625 Riviera Homeowners Ass'n v. Uponor, Inc.*,
824 F. Supp. 3d 838 (N.D. Cal. 2026) ....15

*A.A. v. Roku, Inc.*,
2026 WL 1349064 (N.D. Cal. May 14, 2026) ....11

*Ahlstrom v. DHI Mortg. Co.*,
21 F.4th 631 (9th Cir. 2021) ....5, 12

*Ajamian v. CantorCO2e, L.P.*,
203 Cal. App. 4th 771 (2012) ....13

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
24 Cal. 4th 83 (2000) ....15, 17

*Avery v. TEKsystems, Inc.*,
165 F.4th 1219 (9th Cir. 2026) ....15

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ....7

*Bielski v. Coinbase, Inc.*,
87 F.4th 1003 (9th Cir. 2023) ....13

*Blair v. Rent-A-Center, Inc.*,
928 F.3d 819 (9th Cir. 2019) ....17

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ....12, 13

*California Crane Sch., Inc. v. Google LLC*,
621 F. Supp. 3d 1024 (N.D. Cal. 2022) ....18

*Carwile v. Samsung Telecomms. Am., LLC*,
2013 WL 11030374 (C.D. Cal. July 9, 2013) ....6

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025) ....8

*Circuit City Stores, Inc. v. Ahmed*,
283 F.3d 1198 (9th Cir. 2002) ....16

*Cnty. of Contra Costa v. Kaiser Found. Health Plan, Inc.*,
47 Cal. App. 4th 237 (1996) ....11

*Comer v. Micor, Inc.*,
436 F.3d 1098 (9th Cir. 2006) ....................12

*Crowley Mar. Corp. v. Bos. Old Colony Ins. Co.*,
158 Cal. App. 4th 1061 (2008) ....................11

*Eiess v. USAA Fed. Sav. Bank*,
404 F. Supp. 3d 1240 (N.D. Cal. 2019) ....................13

*Ellis v. Wallet Buddha LLC*,
2025 WL 4061562 (C.D. Cal. Dec. 29, 2025) ....................9

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995)....................12

*Han v. Samsung Telecomms. Am., LLC*,
2014 WL 505999 (C.D. Cal. Jan. 30, 2014) ....................6

*Hansen v. LMB Mortg. Servs., Inc.*,
1 F.4th 667 (9th Cir. 2021) ....................5, 10

*Heckman v. Live Nation Ent., Inc.*,
120 F.4th 670 (9th Cir. 2024) ....................14

*Herzog v. Superior Court*,
101 Cal. App. 5th 1280 (2024) ....................7, 8

*Hodges v. Comcast Cable Commc'ns, LLC*,
21 F.4th 535 (9th Cir. 2021) ....................17

*Hoekman v. Tamko Bldg. Prods., Inc.*,
2015 WL 9591471 (E.D. Cal. Aug. 26, 2015)....................6

*Ingalls v. Spotify USA, Inc.*,
2016 WL 6679561 (N.D. Cal. Nov. 14, 2016) ....................13

*Kater v. Churchill Downs Inc.*,
423 F. Supp. 3d 1055 (W.D. Wash. 2019)....................16

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) ....................8

*Knutson v. Sirius XM Radio Inc.*,
771 F.3d 559 (9th Cir. 2014) ....................7, 11

*KPMG LLP v. Cocchi*,
565 U.S. 18 (2011)....................18

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936)....................2, 17

*Latman v. Burdette*,
366 F.3d 774 (9th Cir. 2004) ....................................................................................9

*Lhotka v. Geographic Expeditions, Inc.*,
181 Cal. App. 4th 816 (2010) ....................................................................................17

*MacClelland v. Cellco P'ship*,
609 F. Supp. 3d 1024 (N.D. Cal. 2022) ....................................................................13, 17

*McGill v. Citibank, N.A.*,
2 Cal. 5th 945 (2017) ....................................................................................17

*McKee v. Audible, Inc.*,
2018 WL 2422582 (C.D. Cal. Apr. 6, 2018) ....................................................................16

*Mohamed v. Uber Techs., Inc.*,
848 F.3d 1201 (9th Cir. 2016) ....................................................................................16

*Montes v. Thorntons LLC*,
831 F. Supp. 3d 860 (N.D. Cal. 2026) ....................................................................13

*Namisnak v. Uber Techs., Inc.*,
971 F.3d 1088 (9th Cir. 2020) ....................................................................................12

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ....................................................................................7, 8

*Norcia v. Samsung Telecomms. Am., LLC*,
845 F.3d 1279 (9th Cir. 2017) .................................................................................... passim

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) ....................................................................................8

*OTO, L.L.C. v. Kho*,
8 Cal. 5th 111 (2019) ....................................................................................15, 16

*Patrick v. Running Warehouse, LLC*,
93 F.4th 468 (9th Cir. 2024) ....................................................................................13

*In re Ring LLC Privacy Litig.*,
2021 WL 2621197 (C.D. Cal. June 24, 2021) ....................................................................12

*Ruiz v. Moss Bros. Auto Grp., Inc.*,
232 Cal. App. 4th 836 (2014) ....................................................................................9, 11

*S.G. v. Epic Games, Inc.*,
796 F. Supp. 3d 614 (N.D. Cal. 2025) ....................................................................11

*In re Samsung Galaxy Smartphone Mktg. & Sales Pracs. Litig.*,
298 F. Supp. 3d 1285 (N.D. Cal. 2018) ....................................................................6

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) ....... 8

*Sheffer v. Samsung Telecomms. Am., LLC*,
2014 WL 506556 (C.D. Cal. Jan. 30, 2014) ....... 6

*Smith v. Spizzirri*,
601 U.S. 472 (2024) ....... 17

*Snow v. Eventbrite, Inc.*,
2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) ....... 9

*Tice v. Amazon.com, Inc.*,
2020 WL 1625782 (C.D. Cal. Mar. 25, 2020), rev'd, 845 F. App'x 535 (9th Cir. 2021) . 11

*Turing Video Tech., Inc. v. AGI7 Inc.*,
2025 WL 579190 (N.D. Cal. Feb. 21, 2025) ....... 18

*Weinstat v. Dentsply Int'l, Inc.*,
180 Cal. App. 4th 1213 (2010) ....... 6

*Wheeler v. LG Elecs. USA, Inc.*,
2024 WL 51353 (E.D. Cal. Jan. 4, 2024) ....... 6

*Windsor Mills, Inc. v. Collins & Aikman Corp.*,
25 Cal. App. 3d 987 (1972) ....... 7

**Statutes**

9 U.S.C. § 3 ....... 17

9 U.S.C. § 4 ....... 2, 5, 10, 18

Cal. Civ. Code § 1633.9 ....... 9

Cal. Civ. Code § 1654 ....... 14

Cal. Penal Code §§ 631, 632 ....... 18

**Rules**

Fed. R. Civ. P. 23(d) ....... 16

Fed. R. Civ. P. 56 ....... 5

Fed. R. Evid. 602 ....... 7, 9

Fed. R. Evid. 901 ....... 9

Fed. R. Evid. 1002 ....... 7

## I. INTRODUCTION

LG moves to compel arbitration under two contracts it cannot show anyone agreed to. The first is the arbitration provision in the Smart TV Terms of Use (the "TV AA"). LG's own evidence shows that its setup flow presents six bundled "consent agreements," describes them as privacy choices, places a "Select All" button directly above "Agree," and never mentions arbitration or a jury waiver on any screen. Durgin Decl., Ex. 1 at 11–17.

The second is the arbitration provision printed in the warranty pamphlet inside the television box (the "Product AA"). Controlling Ninth Circuit law forecloses it. In *Norcia*, the Ninth Circuit held that under California law a purchaser's retention and use of a product, and failure to exercise a mail-in opt-out, do not constitute assent to an arbitration clause in in-box warranty materials, and that no reasonable consumer would expect a warranty document to impose a "freestanding obligation" to arbitrate "claims not involving the warranty." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1284–85, 1289–90 (9th Cir. 2017).

Even if either provision had been formed, neither reaches these claims. The TV AA covers only disputes "arising in connection with this EULA." The Terms of Use never define that term, and the only "EULA" anywhere in the document is a third party's application license in Exhibit A. The clause reads as if copied, unedited, from a different document, has sat unchanged for eight years, and must be construed against its drafter. And the conduct at issue, clandestine Automatic Content Recognition ("ACR") surveillance, is governed, if by anything, by the separate Viewing Information Agreement, which LG's own declarant identifies as the agreement that enables ACR and which contains no arbitration clause LG invokes. Durgin Decl. ¶ 8.

Three further points frame the motion. The Court, not an arbitrator, decides every question presented: the Product AA expressly reserves "issues relating to the scope and enforceability of the arbitration provision and to the arbitrability of the dispute" "for the court to decide," and the TV AA has no delegation clause at all. Next, LG concedes that the TV AA preserves Plaintiffs' injunctive-relief claims for judicial resolution (Mot. at 9 n.2, 17), and the Product AA, which has no such carve-out, cannot waive public injunctive relief in every forum (Part IV.E), so this case remains in this Court however the motion is decided. Nor should any part of it be stayed. Alphonso,

the advertising company at the center of the surveillance, has not moved to compel arbitration and has no agreement with any Plaintiff, and the injunctive-relief claims belong here under LG's own carve-out. A stay of those claims is discretionary under *Landis*, LG has made no showing of hardship, and every month of delay is another month of surveillance. Whatever the Court decides about arbitration, the claims that remain here should proceed without a stay.

The motion should be denied. If the Court concludes that any material fact bearing on formation is genuinely disputed, Plaintiffs demand a jury trial on that issue under 9 U.S.C. § 4.

## II. STATEMENT OF FACTS

### A. LG's Setup Flow Never Discloses Arbitration.

An LG Smart TV is a television. Nothing in LG's evidence suggests that watching broadcast signals or content from an HDMI-connected device requires any agreement. Durgin Decl. ¶¶ 8, 23. LG requires acceptance of its Terms of Use and Privacy Policy, presented during initial setup, only for "Smart TV functionality" such as Netflix or Amazon Prime; a user who declines still has a television that displays broadcast and HDMI content. *Id.* ¶ 8.

The setup flow, as LG's own recreation depicts it, proceeds as follows. After preliminary steps, the user reaches a screen containing a "LEGAL NOTICE" in capital letters stating, among other things, "BY USING YOUR SMART MEDIA PRODUCT, YOU AGREE TO ALL OF THESE TERMS." Ex. 1 at 11–12. The next screen, titled "Terms and Conditions," lists six separate agreements (the Terms of Use, Privacy Policy, Viewing Information Agreement, Voice Information Agreement, Interest-Based & Cross-Device Advertising Agreement, and Marketing Communications Agreement, the last cut off below the fold), and the right-hand panel instructs by default: "You can agree to all the specific consent agreements at once. Please read each specific consent agreement and the Privacy Policy carefully before you agree." Ex. 1 at 13–14. A "Select All" bubble sits directly above the "Agree" button. Ex. 2 at 2. The four agreements other than the Terms of Use and Privacy Policy are dimmed and cannot be viewed at all until the first two are accepted. Durgin Decl. ¶¶ 14, 17.

No screen in the flow mentions arbitration, a class waiver, or a jury waiver; the only reference sits in Section 20 of the Terms of Use text, reachable only by scrolling through the side

panel. *See generally* Exs. 1–3; Ex. 14. LG's own instructional video tells consumers to "select these two options, then press 'Agree.'" ¶[1] 177.

**B. The Two Purported Arbitration Agreements.**

*The TV AA.* Section 20 (later 21) of the Terms of Use, captioned "Dispute Resolution for United States Residents," provides that "any and all disputes arising in connection with this EULA shall be resolved by binding arbitration." Ex. 14 (§ 20, June 2018); Ex. 15 § 21(a) (Jan. 2026). The Terms of Use nowhere describe themselves as a "EULA"; the only defined "EULA" appears in Exhibit A, the Application License Agreement between the user and third-party "Application Providers." Ex. 15, Ex. A. The provision's exceptions paragraph begins "Notwithstanding Section 12(a)," but Section 12 of the Terms of Use is titled "Your account and password," has no subsection (a), and says nothing about disputes; the reference has stayed that way in every version even as the clause moved between Sections 20 and 21. Exs. 14, 15. The provision excepts from arbitration "either of our rights to … seek injunctive relief in a court of law." Ex. 15 § 21(b)(iii). It contains no delegation clause. Its opt-out expires "30 calendar days from the date of the first consumer purchaser's purchase of the product," a window that can close before the terms are ever displayed at setup. *Id.* § 21(g).

*The Product AA.* The warranty card packed inside the television box contains an arbitration provision covering disputes "arising out of or relating in any way to the sale, condition or performance of the product or this Limited Warranty," with the same purchase-date opt-out. Exs. 12–13. It states that "[a]ll issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the arbitration provision and to the arbitrability of the dispute are for the court to decide." Exs. 12 at 2, 13 at 2; *accord* Ex. 16. Assent, in LG's telling, occurs when a consumer "keep[s] this product and do[es] not opt out." *Id.*

**C. Plaintiffs.**

Plaintiff Cazares purchased LG Smart TVs in approximately 2018 or 2019 and in 2025, performed the on-screen setup of each herself, and used them in her home in Banning, California.

[1] All paragraph ("¶") citations are to the Complaint (ECF No. 1), unless otherwise noted.

¶¶ 18–19; Durgin Decl. ¶ 32; Cazares Decl. ¶¶ 3–5. Plaintiff Walsh purchased his LG Smart TV new, in a sealed box, in approximately 2019, and set it up himself. Walsh Decl. ¶¶ 3–4. The Complaint's allegation of a 2024 purchase, ¶ 34, was mistaken, and Plaintiffs will correct it. Plaintiff Willis-Albrigo purchased her LG Smart TV in approximately 2023. Her spouse, Todd Albrigo, unpacked, connected, and performed the entire on-screen setup himself; she did not watch, participate in, or direct any step of it; he accepted nothing on her behalf; and the two never discussed any LG terms. ¶¶ 49, 53; Willis-Albrigo Decl. ¶¶ 4–6; T. Albrigo Decl. ¶¶ 3–4. No Plaintiff recalls ever seeing a screen that presented LG's Terms of Use or asked for agreement to them, and none has seen any screen mentioning arbitration, a class waiver, or a jury waiver. Cazares Decl. ¶¶ 6, 8; Walsh Decl. ¶¶ 5, 7–8; Willis-Albrigo Decl. ¶¶ 5–6. Each Plaintiff used the televisions to view content, including through streaming applications and devices connected via HDMI, and each alleges that LG's ACR software captured, analyzed, and transmitted their viewing data to Alphonso without their knowledge or consent. ¶¶ 20–62.

**D. LG's Evidence.**

LG supports its motion with the declaration of Matthew Durgin. The setup-flow "screenshots" are stills from videos recorded in June and August 2026, years after every Plaintiff's setup, offered as "examples intended to provide a visual guide" on the strength of Durgin's "underst[anding]" that the flow has been "substantially similar" since 2018. Durgin Decl. ¶¶ 10–11. The "consent records" are device-level system logs keyed to serial numbers. They contain duplicate entries at identical timestamps, paired "Select All Withdraw" and "Agree" entries within the same minute, and repeated agree/withdraw cycles within a single minute in the early morning hours. *Id.* ¶ 29. Durgin acknowledges that the logs regenerate whenever a television reboots after "major updates" and whenever the status of any other agreement changes. *Id.* ¶ 31. Nothing in the logs identifies who pressed any button. LG's exhibit of the June 2018 Terms of Use is a four-page excerpt of the arbitration section alone, *id.* Ex. 14; the complete 2018 document is not in the record. Durgin's statement that "[p]rior to July 2026, the TV AA was last amended substantively in June 2018," *id.* ¶ 52, means that LG substantively amended its arbitration provision in July 2026, after

this action was filed on April 30, 2026. (LG's brief moves that date to August 2026 without explanation. Mot. at 4.) That version is not in the record either.

On or about September 9, 2026, more than four months into this litigation, Cazares's television displayed a prompt after an automatic update directing her to "agree" to a new agreement. Cazares Decl. ¶ 9. When she selected "Later," her streaming applications stopped working. *Id.* After several days she relented and pressed "Agree," and the applications still did not work; she was locked out of the streaming features of her own television for more than a week. *Id.* No screen mentioned arbitration, a class waiver, or a jury waiver. *Id.*

## III. LEGAL STANDARD

A motion to compel arbitration is decided under the summary-judgment standard of Rule 56. The court "may conclude as a matter of law that the parties did or did not enter into an arbitration agreement" only where the material facts are undisputed, and "[i]f there is a genuine dispute of material fact," the FAA requires the court to "proceed[] summarily to the trial" of the formation issue, before a jury if one is demanded. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670–72 (9th Cir. 2021); 9 U.S.C. § 4. The party seeking to compel arbitration "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia*, 845 F.3d at 1283. Whether an agreement to arbitrate was formed is always for the court; formation cannot be delegated. *Ahlstrom v. DHI Mortg. Co.*, 21 F.4th 631, 634–35 (9th Cir. 2021).

## IV. ARGUMENT

### A. LG Has Not Carried Its Burden to Prove Formation of Any Agreement to Arbitrate.

#### *1. The Product AA fails as a matter of law under Norcia.*

*Norcia* controls. There, as here, the manufacturer placed an arbitration provision inside a warranty brochure packed in the product box, told consumers they could opt out within 30 days, and argued that keeping and using the product without opting out was assent. The Ninth Circuit rejected each step of that theory. Under California law, "silence or inaction does not constitute acceptance of an offer," and an offeror "cannot prescribe conditions of rejection so as to turn silence on the part of the offeree into acceptance." *Norcia*, 845 F.3d at 1284–85 (citations omitted). The opt-out notice does not change the analysis; a consumer's "failure to opt out … does not make

the arbitration provision enforceable." *Id.* at 1290–91. And "[a] reasonable person in *Norcia*'s position would not be on notice that the brochure contained a freestanding obligation outside the scope of the warranty," nor would a reasonable person "understand that receiving the seller's warranty and failing to opt out of an arbitration provision contained within the warranty constituted assent to a provision requiring arbitration of all claims against the seller, including claims not involving the warranty." *Id.* at 1290.

LG's Product AA has every feature *Norcia* condemned: an in-box warranty card, a keep-the-product theory of acceptance, a purchase-date opt-out, and statutory privacy claims that have nothing to do with the warranty. LG's motion does not cite *Norcia*. Most of its in-box cases predate it. *Sheffer v. Samsung Telecomms. Am., LLC*, 2014 WL 506556 (C.D. Cal. Jan. 30, 2014); *Han v. Samsung Telecomms. Am., LLC*, 2014 WL 505999 (C.D. Cal. Jan. 30, 2014); *Carwile v. Samsung Telecomms. Am., LLC*, 2013 WL 11030374 (C.D. Cal. July 9, 2013); *Hoekman v. Tamko Bldg. Prods., Inc.*, 2015 WL 9591471 (E.D. Cal. Aug. 26, 2015). *Weinstat*, which *Norcia* itself distinguished, addressed warranty formation, not whether a clause in a warranty binds a consumer to arbitrate non-warranty claims. *Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213 (2010); *Norcia*, 845 F.3d at 1288.

LG's two post-*Norcia* cases were product-defect suits. *In re Samsung Galaxy* compelled arbitration only against purchasers whose booklet announced on its cover that it "contains important terms and conditions" accepted "[b]y using this device," and whose arbitration clause sat in a separate legal-information section rather than inside the warranty. It refused to compel arbitration against purchasers whose booklet was titled as a safety and warranty guide, and against a purchaser whose box told him to visit a website for the terms, because neither would tell a reasonable consumer that using the phone meant agreeing to arbitrate. *In re Samsung Galaxy Smartphone Mktg. & Sales Pracs. Litig.*, 298 F. Supp. 3d 1285, 1294–95, 1297–98, 1300–01 (N.D. Cal. 2018). *Wheeler* enforced this same LG provision in a dishwasher-defect case, where the claims concerned the warranty's subject matter. *Wheeler v. LG Elecs. USA, Inc.*, 2024 WL 51353 (E.D. Cal. Jan. 4, 2024). Plaintiffs here assert the "claims not involving the warranty" that *Norcia* places outside any reasonable consumer's expectation of a warranty card. 845 F.3d at 1290. No

Plaintiff signed anything; none read a box notice or warranty card, Cazares Decl. ¶ 7; Walsh Decl. ¶ 6; Willis-Albrigo Decl. ¶ 7; T. Albrigo Decl. ¶ 6; and LG offers only box "specifications" of what boxes "typically would have included." Durgin Decl. ¶¶ 34, 36. Plaintiffs object to that testimony. Fed. R. Evid. 602, 1002. Durgin describes design "specifications," not any box that reached a Plaintiff; he does not say he saw those boxes or reviewed any record of what was packed in them; and what a box "typically" contained is not evidence of what these boxes contained.

*2. The TV AA fails under Berman and Herzog because LG's flow never presented it as a contract.*

An internet-era contract forms only where the offeree receives "reasonably conspicuous notice" of the terms and takes some action that "unambiguously manifests … assent" to them. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856–57 (9th Cir. 2022); *accord Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). California law is more demanding still where arbitration is at stake: "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious," and "[t]his principle of knowing consent applies with particular force to provisions for arbitration." *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (1972); *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565–66 (9th Cir. 2014).

*Herzog* applied these principles to a device-setup flow materially identical to LG's and found no contract. *Herzog v. Superior Court*, 101 Cal. App. 5th 1280 (2024). Dexcom's "Legal" screen told users that by ticking boxes they agreed that their "personal information … will be collected, used and shared consistently with the Privacy Policy and Terms of Use." The court held that a "reasonably prudent user" would not "understand after reading this text that the Terms of Use were intended to govern any matters other than the scope of the user's waiver of privacy rights and the management of the user's personal information," and that Dexcom thereby "undid whatever notice it might have provided." *Id.* at 1297–98, 1301–02.

LG's flow has every defect *Herzog* identified, and more. As shown in Part II.A, *supra*, no screen mentions arbitration, a class waiver, or a jury waiver. Four of the six bundled agreements

cannot even be reviewed until the Terms of Use are accepted. Durgin Decl. ¶¶ 14, 17. A "Select All" option sits directly above "Agree." And the entire flow is preceded by a "LEGAL NOTICE" declaring that "BY USING YOUR SMART MEDIA PRODUCT, YOU AGREE TO ALL OF THESE TERMS." Ex. 1 at 11–14. That is assent by use. It contradicts LG's checkbox theory, and it is the browsewrap-style assent California law rejects. *See Norcia*, 845 F.3d at 1284–85; *Nguyen*, 763 F.3d at 1178–79. Nor is the Complaint an admission. The passage LG cites, Mot. at 8 (citing ¶ 179), quotes LG's instruction that the Terms are "required for you to use the basic Smart services of your TV"; that describes what LG told consumers, not a contract any Plaintiff saw, and a click so produced is exactly the problem *Herzog* found fatal, not its cure.

LG's authorities involved the opposite design: a single, clearly labeled agreement, presented for individual assent, with conspicuous notice next to the action button. *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515–17 (9th Cir. 2023); *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 461, 470–71 (2021); *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005 (9th Cir. 2024). None involved bundled agreements, a Select-All shortcut, an assent-by-use legal notice, or a screen describing the terms as privacy consents. *Compare Chabolla v. ClassPass Inc.*, 129 F.4th 1147 (9th Cir. 2025) (no contract formed where flow failed to conspicuously present terms).

*3. LG's evidence cannot establish formation as to any Plaintiff, and at a minimum a jury must resolve the disputes it creates.*

Even on its own terms, LG's proof fails. Courts may resolve notice and assent as a matter of law only "where the authenticity of screenshots is not subject to factual dispute." *Oberstein*, 60 F.4th at 518; *Keebaugh*, 100 F.4th at 1015. In *Chabolla*, the Ninth Circuit relied on images "in substantially the same form" as those the plaintiff saw only because "[t]he parties [we]re satisfied that these images sufficiently represent the webpages" at issue. 129 F.4th at 1151 n.2. Plaintiffs are not satisfied here, with good reason. LG offers stills from videos recorded in June and August 2026 to prove the content of setup flows completed between 2019 and 2025, supported by nothing more than a declarant's "underst[anding]" that the flow has been "substantially similar" for eight years. Durgin Decl. ¶¶ 10–11. That is not personal knowledge of what any Plaintiff saw, and Plaintiffs object to Durgin ¶¶ 10–11 and Exhibits 1–3 on that ground and for want of

authentication. Fed. R. Evid. 602, 901(a). A witness "may testify only about matters on which he or she has first-hand knowledge," *Latman v. Burdette*, 366 F.3d 774, 787 (9th Cir. 2004), and a recording made in 2026 "falls short of what would be required to prove what Plaintiff saw" years earlier. *Ellis v. Wallet Buddha LLC*, 2025 WL 4061562, at *5 (C.D. Cal. Dec. 29, 2025). LG's own exhibit says as much: the Terms of Use it filed warn that the terms applicable to a given television depend on its model and software version, Ex. 15 at 2, and LG has not identified which version any Plaintiff's television ran. Its September 2026 rollout, which reached one of Cazares's televisions and not the other, shows the same thing. Cazares Decl. ¶ 9. The two Plaintiffs who set up their own televisions do not recall any screen that presented LG's Terms of Use or asked them to agree to them, on any date in LG's logs or at any other time; none of the three has ever seen a screen mentioning arbitration, a class waiver, or a jury waiver; and LG has never shown any of them what appeared on their screens on any date it relies on. Cazares Decl. ¶¶ 6, 8; Walsh Decl. ¶¶ 5, 7–8; Willis-Albrigo Decl. ¶¶ 5–6. The Complaint, for its part, alleges a materially different presentation, including "at least seven distinct agreements, some of which are not visible without scrolling." ¶ 178; *see id.* ¶¶ 171–191. That gap is not Plaintiffs' to close. The burden of proving what the flow showed each Plaintiff is LG's, *Norcia*, 845 F.3d at 1283, and a movant "would only be able to carry its burden if it could show what the agreements looked like during the period when the plaintiffs would have actually seen them." *Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *6 (N.D. Cal. Oct. 19, 2020). LG has offered nothing from those years.

The "consent records" fare no better. Under California law, an electronic record binds a person only upon proof that the electronic act was "the act of" that person, and a declaration that cannot show who clicked cannot authenticate assent. Cal. Civ. Code § 1633.9(a); *Ruiz v. Moss Bros. Auto Grp., Inc.*, 232 Cal. App. 4th 836, 838, 843–44 (2014). LG's logs are keyed to device serial numbers, not people. They record paired "Agree" and "Select All Withdraw" entries within the same minute, duplicate entries at identical timestamps, and cycles of agreement and withdrawal within a single minute before 3:00 a.m. and at 4:00 a.m. Durgin acknowledges that the system regenerates consent entries whenever a television receives a major update to the TV Terms or whenever any other agreement's status changes. Durgin Decl. ¶¶ 29, 31. The logs cannot

distinguish a human choice from a machine event, let alone identify the human. Walsh's logs illustrate the point. They contain twenty-six entries over seven years, fifteen of them in clusters of "Withdraw" and "Agree" entries recorded within a single minute in October 2019, June 2020, and July 2020. *Id.* ¶ 29. Walsh set up the television himself in 2019 and does not recall any screen that presented LG's Terms of Use or asked him to agree to them, then or on any of those dates; he recalls taking no action to agree to, withdraw from, or re-agree to anything; and LG has never shown him what appeared on his screen on any of the dates it relies on. Walsh Decl. ¶¶ 3–4, 7. Nor does the 2025 entry Durgin singles out help LG. Durgin concedes that a status change to any User Agreement re-records the status of every other agreement, including the TV Terms, *id.* ¶ 31, so the "agree" entry recorded after the May 28, 2025 withdrawal, *id.* ¶ 33, could reflect a change to the Marketing, Voice, or Interest-Based Advertising agreement rather than a re-acceptance of the TV AA, and Durgin's declaration does not say which. Cazares's logs are the same: fourteen entries across two televisions, including a "Withdraw" and an "Agree" entry seventy-five seconds apart in June 2025, none of which she recalls and none of which LG has ever connected to a screen she saw. Cazares Decl. ¶ 8; Durgin Decl. ¶ 29.

These are genuine disputes of material fact on formation: who set up each television, what screens they saw, what the flow looked like in the relevant years, and whose acts the logs record. Under *Hansen*, the Court cannot resolve them on this motion. They go to trial, and Plaintiffs demand a jury. 1 F.4th at 670–72; 9 U.S.C. § 4.

*4. Willis-Albrigo never agreed to anything, and no doctrine imputes her spouse's clicks to her.*

LG concedes that the first consent record for Willis-Albrigo's television reflects "the initial setup of the TV." Durgin Decl. ¶ 30. The Complaint alleges, and LG does not refute, that her spouse performed that setup alone, and both spouses now confirm it under oath. Todd Albrigo unpacked, connected, and set up the television himself; he acted for himself, accepted nothing on her behalf, and never discussed any LG terms with her; she did not watch, participate in, or direct any step of the setup, and has never authorized anyone to agree to arbitration for her. ¶ 53; T. Albrigo Decl. ¶¶ 3–4; Willis-Albrigo Decl. ¶¶ 4–6, 11. LG's suggestion that later device-level

entries "suggest[] acceptance by her," Mot. at 10, is speculation. The logs identify a television, not a person, and Willis-Albrigo attests that she took none of the actions they record. Willis-Albrigo Decl. ¶ 10; *Ruiz*, 232 Cal. App. 4th at 838, 843–44.

*Knutson* controls. A consumer who "did not know that he was entering into a contractual relationship" cannot be bound; a reasonable person would not understand that using a product binds her to an unseen contract, "let alone one that contained an arbitration provision without any notice of such terms." 771 F.3d at 566. Willis-Albrigo owned a television. She had no reason to think she had a contract with LG. *Knutson* is published circuit authority, and it resolves this issue against LG.

LG's contrary authority does not reach this case. Its California cases refused to bind the nonsignatory and explain the "preexisting relationship" doctrine: the relationship "generally gives the party to the agreement authority to bind the nonsignatory," as with an agent or a parent. *Crowley Mar. Corp. v. Bos. Old Colony Ins. Co.*, 158 Cal. App. 4th 1061, 1069–70 (2008); *Cnty. of Contra Costa v. Kaiser Found. Health Plan, Inc.*, 47 Cal. App. 4th 237, 242–45 (1996). Todd Albrigo had no such authority and exercised none. T. Albrigo Decl. ¶ 4; *cf. S.G. v. Epic Games, Inc.*, 796 F. Supp. 3d 614, 619–20 (N.D. Cal. 2025) (records that cannot show who clicked do not carry the movant's burden). LG's federal cases are district-court decisions and one unpublished disposition, each involving a service account the non-signatory herself used: Alexa through her husband's account in *Tice*, and a Roku account "required to … activate and use" the devices in *Roku*. *Tice v. Amazon.com, Inc.*, 2020 WL 1625782 (C.D. Cal. Mar. 25, 2020), *rev'd*, 845 F. App'x 535, 538 (9th Cir. 2021) (Eaton, J., dissenting) (rejecting binding a spouse "to limitless terms in an adhesion contract based solely on her marital relationship"); *A.A. v. Roku, Inc.*, 2026 WL 1349064 (N.D. Cal. May 14, 2026).

None of those premises is present here. No LG account is required to own or watch a television. Willis-Albrigo used no LG account and no LG member service, and none was ever created in her name. Willis-Albrigo Decl. ¶ 8; T. Albrigo Decl. ¶ 5. Her television displays streaming applications, which LG's own Terms of Use place "outside the scope of these Terms of Use," Ex. 15 § 9, and HDMI content that requires no agreement at all. LG's terms contain no

household-application clause. To the contrary, they make the accepting user "responsible for ensuring that all persons who access the Services … are aware of these Terms," which presupposes that other household users are not parties. *Id.* § 6. Nor did she derive any benefit from an LG agreement; her claims arise from being surveilled, not from using LG's services. That is the line *In re Ring* draws (equitable doctrines do not bind persons "passively exposed" to a surveillance device), and the Ninth Circuit's: equitable estoppel reaches only a non-signatory who "knowingly exploits the agreement" and seeks its benefits. *In re Ring LLC Privacy Litig.*, 2021 WL 2621197, at *7–8 (C.D. Cal. June 24, 2021); *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006); *accord Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088 (9th Cir. 2020). Willis-Albrigo seeks nothing under any LG contract.

**B. The Court, Not an Arbitrator, Decides Enforceability and Scope.**

LG's delegation argument fails for three independent reasons. First, formation is always for the court, and LG cannot establish formation. *Ahlstrom*, 21 F.4th at 634–35. No delegation clause can operate until it does.

Second, the Product AA reserves the gateway issues for this Court: "issues relating to the scope and enforceability of the arbitration provision and to the arbitrability of the dispute are for the court to decide." Exs. 12 at 2, 13 at 2; *accord* Ex. 16. LG's brief invokes delegation only under the TV AA and never mentions that the other instrument it relies on says the opposite. Two agreements invoked in the same motion that point in opposite directions on the same question cannot supply "clear and unmistakable" evidence of an intent to delegate. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (silence or ambiguity resolved against delegation).

Third, the TV AA has no delegation clause, only a reference to the AAA Consumer Arbitration Rules. Plaintiffs do not object to the Court's noticing the existence and text of the AAA rules LG filed (Dkt. 35-1), but those rules took effect May 1, 2025, after three of the four televisions were set up, and the Terms of Use incorporate the rules only by noting that they are "available online at www.adr.org," Ex. 15 § 21(c), an external document no Plaintiff was ever shown. In *Brennan*, the Ninth Circuit expressly "limit[ed]" its incorporation holding "to the facts

of the present case, which … involve an arbitration agreement between sophisticated parties," and declined to decide whether the rule extends "to unsophisticated parties or to consumer contracts." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130–31 (9th Cir. 2015). Most district courts in this circuit have held that it does not. *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1031–32 (N.D. Cal. 2022); *Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1252–53 (N.D. Cal. 2019) (collecting cases); *Ingalls v. Spotify USA, Inc.*, 2016 WL 6679561, at *4 (N.D. Cal. Nov. 14, 2016). The Ninth Circuit has since left the question open, and Plaintiffs (and Willis-Albrigo's spouse) are ordinary consumers with no legal training who had never heard of the AAA or seen its rules. Cazares Decl. ¶ 12; Walsh Decl. ¶ 12; Willis-Albrigo Decl. ¶ 12; T. Albrigo Decl. ¶ 7; *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 481 (9th Cir. 2024); *Eiess*, 404 F. Supp. 3d at 1253. California law, which governs the interpretation of these consumer contracts, is more demanding still. The clear-and-unmistakable test is a "heightened standard," and incorporating a set of rules does not show that a consumer intended to send enforceability to the arbitrator, because "[t]here are many reasons for stating that the arbitration will proceed by particular rules." *Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 787–90 (2012).

This Court's decision in *Montes* is not to the contrary. The agreement there contained an express delegation clause, "[a]ll challenges to the interpretation or enforceability of any provision of this Agreement shall be brought before the arbitrator," the discussion of incorporation was secondary to that text, and the case involved an employee, not a consumer, so the question *Brennan* reserved was not presented. *Montes v. Thorntons LLC*, 831 F. Supp. 3d 860, 865–66 (N.D. Cal. 2026). The TV AA has no such clause. Finally, even if delegation were otherwise available, Plaintiffs specifically challenge any delegation on the grounds set out above and in Part IV.D, *infra*. The concealed, bundled, misdescribed presentation that defeats assent to the TV AA defeats assent to any implicit delegation within it, and the unconscionable features that permeate the provision permeate its allocation of gateway questions as well. A party may challenge a delegation provision "for the same reasons" it challenges the agreement, so long as the challenge is directed at the delegation, as this one is. *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009–10 (9th Cir. 2023);

*see Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670 (9th Cir. 2024) (affirming denial where delegation clause itself was unconscionable).

**C. Plaintiffs' Claims Fall Outside Both Provisions.**

*1. The TV AA's scope is keyed to a "EULA" that is not the Terms of Use.*

The TV AA covers disputes "arising in connection with this EULA." The Terms of Use do not define "EULA" and never refer to themselves by that name. The only "EULA" defined anywhere in the document is the third-party Application Provider's End User License Agreement described in Exhibit A. Ex. 15. LG asserts that the TV Terms are "also referred to therein as an End User License Agreement, or 'EULA'" (Mot. at 3, citing Ex. 15 at 1), but the exhibit does not support the assertion. Page one of Exhibit 15 contains no such reference, and Durgin himself calls the document the "TV Terms" throughout.

The text explains why. The provision appears to be transplanted, unedited, from a different LG agreement. Its exceptions paragraph has begun "Notwithstanding Section 12(a)" in every version in the record: June 2018 (when the provision was Section 20), January 2024 (Section 20), July 2024 (Section 21), and January 2026 (Section 21). Exs. 14–15. In the record provided by LG, there is not now, and never has been, a Section 12(a) that has anything to do with dispute resolution. A jury-trial waiver whose scope is defined by a document the consumer was not accepting, drafted by LG and republished without correction for eight years, is at best ambiguous. Ambiguity in an adhesive arbitration clause is construed against the drafter. Cal. Civ. Code § 1654 (uncertain contract language "should be interpreted most strongly against the party who caused the uncertainty to exist").

*2. The challenged conduct arises under, if anything, the Viewing Information Agreement.*

LG's own declarant concedes that ACR, the surveillance technology at the heart of every claim, is enabled by accepting the separate Viewing Information Agreement, not the Terms of Use. Durgin Decl. ¶ 8. LG identifies no arbitration clause in the Viewing Information Agreement and invokes none. The Terms of Use, for their part, disclaim the very subject matter LG now sweeps within them: third-party applications and services "are outside the scope of these Terms of Use." Ex. 15 § 9. And Plaintiffs' statutory claims under CIPA, the Wiretap Act, the VPPA, and the

CDAFA impose liability for interception and disclosure regardless of any contract. They would exist if no Plaintiff had ever accepted a single LG agreement. This dispute does not "arise in connection with" the Terms of Use in any sense.

*3. The Product AA does not reach non-warranty privacy claims.*

The Product AA covers disputes "arising out of or relating in any way to the sale, condition or performance of the product or this Limited Warranty." Covert surveillance and monetization of viewing data by an advertising affiliate is not the "sale," the "condition," or the "performance" of a television, and *Norcia* holds that a reasonable consumer would not understand an in-box warranty to require arbitration of "claims not involving the warranty." 845 F.3d at 1290; *accord 1625 Riviera Homeowners Ass'n v. Uponor, Inc.*, 824 F. Supp. 3d 838, 851–52 (N.D. Cal. 2026). In any event, the Product AA itself assigns this scope question to the Court. Exs. 12 at 2, 13 at 2.

**D. If Reached, Both Provisions Are Unconscionable.**

Unconscionability requires procedural and substantive elements on a sliding scale: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required," and vice versa. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000); *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 125–26 (2019).

The procedural unconscionability here is substantial. These are contracts of adhesion presented after purchase, when the consumer's money is spent and the television is already on the wall. The terms are bundled six deep, mislabeled as privacy "consent agreements," gated so that most cannot be reviewed until the first are accepted, and accompanied by the vendor's own instruction to check the boxes and press "Agree". LG's conduct during this litigation shows how that "assent" is produced. In September 2026, when Cazares declined to "agree" to LG's newest terms, her television disabled its streaming applications until she relented, Part II.D, *supra*, although LG's own Terms promise that a consumer "may reject any such change by sending us written notice within 30 days of the change." Ex. 15 § 21(h). Those terms are not in the record and LG does not rely on them, which is just as well. Pushing new terms to a represented plaintiff while her class action is pending, on an agree-or-lose-the-product footing, is the kind of conduct that permits a court to refuse to enforce whatever results. *Avery v. TEKsystems, Inc.*, 165 F.4th 1219,

1228–31 (9th Cir. 2026) (Rule 23(d) authority "includes the authority to decline to enforce an arbitration agreement" obtained mid-litigation; the FAA does not bar the remedy); *Kater v. Churchill Downs Inc.*, 423 F. Supp. 3d 1055, 1062–63 (W.D. Wash. 2019) (pop-up requiring "I Agree" to keep using a game already paid for was coercive, and an opt-out the pop-up never mentioned did not cure it); *McKee v. Audible, Inc.*, 2018 WL 2422582, at *6–7 (C.D. Cal. Apr. 6, 2018) (coercive for a company to "freeze a customer out of using its product," one "already paid for," unless the customer "accepts new terms and conditions"). Should LG seek to rely on terms obtained from any Plaintiff or putative class member after this action was filed, Plaintiffs request that the Court decline to enforce them under Rule 23(d). Both oppression and surprise are present. *OTO*, 8 Cal. 5th at 126–29; ¶¶ 171–191.

The opt-out cures nothing. In *Mohamed*, the opt-out ran from the driver's own in-app acceptance of the agreement, a right its holder could actually exercise. *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1210–11 (9th Cir. 2016). LG's opt-out expires 30 days after "the first consumer purchaser's purchase," but the terms are first displayed at setup. For a consumer who sets up the television later, receives it as a gift, buys it second-hand, or, like Willis-Albrigo, never performs setup at all, the window closes before the person LG seeks to bind ever sees the terms. An opt-out that cannot be exercised is illusory and cures nothing. *Cf. Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1199–1200 (9th Cir. 2002) (opt-out defeats a procedural-unconscionability challenge only where the party had a meaningful opportunity to exercise it).

Substantively, the provisions are one-sided in LG's favor. The TV AA exempts intellectual-property claims, the claims a manufacturer brings, from arbitration while compelling arbitration of the consumer's claims. Ex. 15 § 21(b)(iv). It threatens consumers with reimbursement of LG's arbitration fees for claims an arbitrator later deems "frivolous." *Id.* § 21(e). And because the opt-out runs from the first purchaser's purchase date rather than from the consumer's first sight of the terms, it is a right that later purchasers, gift recipients, and other household members can never use, while LG gives up nothing. Where, as here, such terms permeate an arbitration provision, courts refuse to enforce it rather than sever, and the Court should do the same here. An agreement with "more than one unlawful provision" is permeated by

unconscionability, because "[s]uch multiple defects indicate a systematic effort to impose arbitration … not simply as an alternative to litigation, but as an inferior forum that works to the [stronger party's] advantage." *Lhotka v. Geographic Expeditions, Inc.*, 181 Cal. App. 4th 816, 825–26 (2010) (quoting *Armendariz*, 24 Cal. 4th at 124); *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1032–33 (N.D. Cal. 2022); *Armendariz*, 24 Cal. 4th at 122–25.

**E. Plaintiffs' Injunctive-Relief Claims Remain in This Court Regardless.**

LG concedes that the TV AA "excludes Plaintiffs' requests for injunctive relief." Mot. at 9 n.2; Ex. 15 § 21(b)(iii) (preserving "either of our rights to … seek injunctive relief in a court of law"). Those requests are, in substantial part, public injunctive relief. Plaintiffs seek forward-looking orders requiring truthful disclosures and affirmative consent before any ACR collection from any user, and barring dark-pattern interfaces. ¶ 666. That relief benefits the plaintiff, "if at all, only incidentally and/or as a member of the general public." *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 541–42 (9th Cir. 2021) (quoting *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017)). To the extent LG relies on the Product AA, which has no injunctive-relief exception and mandates individual arbitration, a waiver of the right to seek public injunctive relief in every forum is unenforceable under *McGill*, and the FAA does not preempt that rule. *McGill*, 2 Cal. 5th at 961–62; *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 822–23 (9th Cir. 2019).

**F. The Court Should Decline to Stay the Non-Arbitrable Claims.**

*1. The requested stays are discretionary and unjustified.*

A Section 3 stay is mandatory only for claims actually compelled to arbitration. *Smith v. Spizzirri*, 601 U.S. 472, 475–78 (2024). Whether to stay non-arbitrable claims, meaning the injunctive-relief claims LG's clause reserves for court and all claims against Alphonso, which has no arbitration agreement and has not moved, is a matter of discretion governed by *Landis*, and the proponent must make out a clear case of hardship or inequity if there is even a fair possibility that the stay will damage someone else. *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). And where a complaint contains both arbitrable and non-arbitrable claims, the FAA "requires piecemeal resolution when necessary to give effect to an arbitration agreement"; courts may not decline to

adjudicate the non-arbitrable claims. *KPMG LLP v. Cocchi*, 565 U.S. 18, 19–22 (2011) (per curiam).

LG cannot show hardship, and a stay would harm Plaintiffs and the putative class. No stay can deliver the efficiency LG promises, because this litigation continues in this Court regardless—LG's own carve-out keeps the injunctive-relief claims here. The claims against Alphonso also rest on Alphonso's own conduct—its receipt, processing, matching, and monetization of ACR data, and are independently actionable under CIPA §§ 631 & 632, the Wiretap Act, and the common law—whatever an arbitrator might say about LG. An arbitral award would bind neither this Court nor Alphonso, a stranger to any arbitration, so there is no real risk of "inconsistent decisions." *California Crane Sch., Inc. v. Google LLC*, 621 F. Supp. 3d 1024, 1028–29 (N.D. Cal. 2022). And delay is itself prejudice here. The surveillance is ongoing, the core evidence sits with Alphonso in this District, and every month of delay is another month of surreptitious data collection from a putative class of millions.

*2. Turing Video does not support a blanket stay here.*

In *Turing Video*, this Court stayed an entire action pending arbitration. *Turing Video Tech., Inc. v. AGI7 Inc.*, 2025 WL 579190 (N.D. Cal. Feb. 21, 2025). But there two commercial parties were bound by a concededly valid arbitration agreement, every substantive claim was arbitrable, and only a request for injunctive relief remained. Here formation is genuinely disputed under consumer-contract standards; a co-defendant at the center of the data flows has not moved to compel and has no agreement or right to invoke arbitration; and the claims reserved for this Court are injunctive-relief claims that LG's own carve-out sends here. A stay would streamline nothing. It would suspend the only forum in which most of this case can be heard.

## V. CONCLUSION

LG has not proved that any Plaintiff agreed to arbitrate, and neither provision it invokes reaches these claims. The motion to compel arbitration and to stay this case should be denied in its entirety, and the claims that remain in this Court should proceed without a stay. In the alternative, Plaintiffs request a trial before a jury on contract formation under 9 U.S.C. § 4.

Dated: September 18, 2026

Respectfully submitted,

*By: /s/ Andrew Ready Tate*
PEIFFER WOLF CARR
KANE CONWAY & WISE LLP
Andrew Ready Tate (admitted pro hac vice)
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
Tel: (314) 669-3600
atate@peifferwolf.com

Melisa A. Rosadini-Knott (California Bar No. 316369)
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010-1923
Tel: (323) 982-4109
mrosadini@peifferwolf.com

Brandon M. Wise (admitted pro hac vice)
One US Bank Plaza, Suite 1950
St. Louis, MO 63101
Tel: (314) 833-4825
bwise@peifferwolf.com

Counsel for Plaintiffs and the Proposed Class

**CERTIFICATION OF GENERATIVE AI USE**

Pursuant to the Court's Civil Standing Order, the undersigned certifies that generative artificial intelligence tools were used in the preparation of portions of this filing, and that lead trial counsel has personally reviewed and verified the accuracy of all representations of fact and procedural history, all citations of legal authority, and all quotations contained herein, including that each cited authority stands for the proposition for which it is cited and remains good law.

*/s/ Andrew Ready Tate*
Andrew Ready Tate