Tina Wolfson (SBN 174806)
Bradley K. King (SBN 274399)
AHDOOT & WOLFSON, PC
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Tel: (310) 474-9111
E: twolfson@ahdootwolfson.com
E: bking@ahdootwolfson.com

Andrew Ready Tate (pro hac vice)
PRIVACY RIGHTS LAW LLC
3379 Peachtree Road NE, Suite 700
Atlanta, Georgia 30326
Tel: (678) 250-5885
E: tate@privacyrightslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEONA CAZARES, MICHAEL WALSH, and LAURA WILLIS-ALBRIGO, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>LG ELECTRONICS U.S.A., INC. and ALPHONSO INC.,<br><br>*Defendants*. | Case No.: 5:26-cv-03840-EKL<br><br>**PLAINTIFFS' STATEMENT OF RECENT DECISION IN OPPOSITION TO DEFENDANT LG ELECTRONICS U.S.A., INC.'S MOTION TO COMPEL ARBITRATION AND STAY CASE (CIVIL L.R. 7-3(d)(2))**<br><br>Date: November 4, 2026<br>Time: 10:00 a.m.<br>Judge: Hon. Eumi K. Lee<br>Courtroom: 7<br><br>JURY TRIAL DEMANDED |

Pursuant to Civil Local Rule 7-3(d)(2), Plaintiffs bring to the Court's attention the following judicial opinion, issued after the filing of Defendant LG Electronics U.S.A., Inc.'s Reply (Dkt. 38) on October 9, 2026, and relevant to the Motion to Compel Arbitration and Stay the Case set for hearing on November 4, 2026:

*N.G. v. Walgreen Co.*, No. 26-cv-02994-RS, 2026 WL 3136303 (N.D. Cal. Oct. 20, 2026) (Seeborg, C.J.) (order granting in part and denying in part motion to compel arbitration).

A true and correct copy of the opinion is attached as Exhibit A.

Dated: October 27, 2026

Respectfully submitted,

By: */s/ Andrew Ready Tate*

Andrew Ready Tate (pro hac vice)
PRIVACY RIGHTS LAW LLC
3379 Peachtree Road NE, Suite 700
Atlanta, Georgia 30326
Tel: (678) 250-5885
E: tate@privacyrightslaw.com

Tina Wolfson (SBN 174806)
Bradley K. King (SBN 274399)
AHDOOT & WOLFSON, PC
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Tel: (310) 474-9111
E: twolfson@ahdootwolfson.com
E: bking@ahdootwolfson.com

Counsel for Plaintiffs and the Proposed Class

# EXHIBIT A

to Plaintiffs' Statement of Recent Decision

N.G. v. Walgreen Co., No. 26-cv-02994-RS (N.D. Cal. Oct. 20, 2026)

Case 5:26-cv-02994-ESL Document 52 Filed 10/27/26 Page 1 of 17 PageID #: 863

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

N.G., et al.,

Plaintiffs,

v.

WALGREEN CO.,

Defendant.

Case No. 26-cv-02994-RS

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL ARBITRATION**

## I. INTRODUCTION

Plaintiffs bring this action on behalf of themselves and of a putative nationwide class to challenge what they claim is Walgreen's practice of transmitting consumers' personally identifiable and sensitive health information to third parties using digital tracking technologies. They allege violations of Federal wiretapping laws and various California statutes, and they also assert numerous common law claims under both California and Illinois law. Walgreen argues that the named Plaintiffs all agreed to its terms of use (TOUs), which throughout the relevant period contained provisions not just requiring arbitration of all disputes but also delegating questions of arbitrability to the arbitrator. As such, Walgreen moves to compel arbitration and to stay this action pending the results of that process. Plaintiffs counter that they never agreed to the terms of use, that the arbitration clause is unconscionable, and that the delegation clause suffers from both of those faults, too.

As is often the case with electronic contracts, the particular user experience is critical, and

United States District Court
Northern District of California

United States District Court
Northern District of California

adjudication is fact specific. Here, the four named Plaintiffs encountered at least two different user interfaces (UIs) when they allegedly agreed to the TOUs. The differences among those UIs matter and yield different results as to formation. As such, Walgreen's motion is granted as to two of the Plaintiffs but denied as to the others.

## II. BACKGROUND

The named Plaintiffs here are four individuals, proceeding under pseudonym to protect their private health-related information, who each allege that Walgreen improperly shared their protected health information with advertisers through digital tracking tools embedded on its website. R.S. signed up for a Walgreen account in 2018, via the company's website. N.G. similarly created an account in 2021. R.L. and I.P., on the other hand, allege violations stemming from using Walgreen's website to sign up for vaccine appointments, beginning in September 2024.

In line with those different timeframes and use cases, the Plaintiffs here encountered at least two different UIs when they allegedly agreed to Walgreen's Terms of Service. The UI that R.S. encountered in 2018 is not clear, although Walgreen contends that it was similar to the 2021 UI that N.G. saw. The 2021 version of the account sign-up page featured a check-box at the bottom of the page, with adjacent text reading: "I read and agree to the Walgreens Terms of Use."



The underlined text is colored blue and contains a hyperlink to the relevant TOUs.

Both R.L. and I.P. encountered the September 2024 version of the vaccine appointment scheduling page. That UI featured a check-box as well, but the adjacent text was different. It read:

> "By checking this box, I agree to receive automated text messages to the mobile phone number listed above from Walgreens about both this appointment (including failure to complete the appointment, confirmation, cancellation, and reminder notices) and any previously scheduled appointments for which I have consented to receive SMS text messages. I'm aware that mobile messages and data rates may apply, and that my consent is not a condition for purchasing the services. Reply STOP to opt-out. I also agree to the Walgreens Terms of Use and Privacy Policy."[1]

As before, the underlined text was blue and contained hyperlinks to the relevant policies. Here, however, a user did not have to check the box to proceed to the next page by clicking "Next." Dkt. 31-2 at 3.




[1] The screenshots reflect the initial filing, which erroneously did not show these terms as underlined. However, the screenshot attached to Walgreen's reply brief, which corrects that point, also omits most of the remainder of the page as users would have seen it. As such, this opinion includes only the earlier filed screenshots, which present fuller context necessary for analysis under the *Berman* test for reasonably conspicuous notice, discussed below. However, the fact that the terms are underlined is also relevant to the analysis.

Walgreen's TOUs changed over time, as well, at least in form. The 2018 TOUs mentioned, in bolded text in the introduction, that users agreed to be bound by all of the terms, including "**resolving disputes via binding arbitration**." Dkt. 19-6 (emphasis in original). The TOUs did not expand upon that provision until section VII, "Dispute Resolution," at which point Walgreen explained that any arbitration would be conducted "by the American Arbitration Association (AAA) under its rules and procedures, including the AAA's Supplementary Procedures for Consumer-Related Disputes (as applicable), as modified by these Terms." *Id*. The 2021 terms featured a similar setup, with identical bolded text on page one and a similar section VII explaining dispute resolution procedures, including incorporation of the AAA rules and Supplementary Procedures. Dkt. 19-5. In both cases, the word "rules" was colored blue, and contained a hyperlink to the AAA rules, but in neither case was that text underlined or bolded.

The 2024 TOUs, by contrast, feature on the first page an "IMPORTANT ARBITRATION NOTICE," followed by a full paragraph explaining the basics of that agreement. Dispute Resolution moves from section VII to section II, and the section header now reads "Dispute Resolution: Binding Individual Arbitration & Waiver of Class/Representative Actions and Jury Trials ('Agreement to Arbitrate')." Dkt 19-2. Also, the AAA Rules incorporation was updated to reflect that arbitration would be conducted by "National Arbitration and Mediation ('NAM')," according to that organization's rules.

Within each of these TOUs, Walgreen provided the option to opt out by written notice mailed within 30 days of either first accessing its services or accepting any subsequently published version of the TOUs. However, such an opt-out would have "no effect on any previous, other, or future arbitration agreements that you may have with us." Dkt. 19-2.

Plaintiffs filed this lawsuit in April 2026 and submitted an amended complaint 10 days later. In June, Defendant Walgreen moved to compel arbitration.

## III. LEGAL STANDARD

The Federal Arbitration Act (FAA) governs arbitration agreements. 9 U.S.C. § 2. Under the FAA, a party can seek to compel arbitration in federal district court. *Id.* § 4. To decide such a

United States District Court
Northern District of California

United States District Court
Northern District of California

motion to compel, a district court must determine (1) whether a valid agreement to arbitrate exists, and if so, (2) whether the agreement encompasses the present dispute. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1017 (9th Cir. 2016). Since arbitration is a matter of contract, parties may use general contract defenses to contest formation and enforceability of an alleged agreement to arbitrate. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011). Disputes about formation are "generally for courts to decide," *Granite Rock Co. v. International Broth. of Teamsters*, 561 U.S. 287, 296 (2010), as are disputes about an arbitration provision's enforceability or applicability to the dispute at issue. *Id.* at 299-300. Parties may agree to delegate certain "gateway" issues, such as the validity or applicability of an arbitration agreement, to the arbitrator. *Ahlstrom v. DHI Mortgage Co., Ltd., L.P.*, 21 F.4th 631, 634-35 (9th Cir. 2021) (*citing Rent-A-Ctr., W. Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). However, parties cannot delegate questions of formation to the arbitrator. *Ahlstrom*, 21 F.4th at 635.

## IV. DISCUSSION

### A. <u>Whether There was Valid Formation of an Arbitration Agreement with Plaintiffs</u>

Formation in the context of electronic contracts is an evolving area of law, but cases have yielded a general framework to evaluate the wide variety of fact patterns under which users purportedly agree to online TOUs and other contractual provisions.

In the Ninth Circuit and under California law, the underlying inquiry focuses on the extent of notice provided to the user that they are entering a contractual agreement. The cases sort these internet contracts into four buckets, "classified by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024). At one end of the spectrum, "browsewrap" agreements, in which a user purportedly agrees to terms merely by continuing to browse a website that somewhere mentions the existence of TOUs, are routinely not enforced. *Id.* At the other end of the spectrum, scrollwrap agreements—which require the user to scroll through the terms of service before clicking a mandatory "I agree" button or box—give "the strongest notice." *Id.* Clickwrap agreements, which require a user to click on an "I agree" box after

being presented with a list of terms and conditions of use, likewise have been routinely enforced. *Id.* Sign-in wrap agreements fall somewhere in the middle. They do not require a user to read or even necessarily to see the TOUs, as in a clickwrap or scrollwrap agreement. However, unlike browsewrap, sign-in wrap UIs do require users to advance through a sign-in or similar page that states that by clicking some button, the user assents to the TOUs. The enforceability of such sign-in wrap agreements depends on the level of inquiry notice available to the user. *Id.* Under California law, such an agreement may be enforceable if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).

Given the highly fact-bound nature of these determinations, it is unsurprising that the different UIs each Plaintiff encountered may yield different results. For the reasons explained fully below, R.S. and N.G. formed agreements to arbitrate with Walgreen, but R.L. and I.P. did not.

*1. The Account Creation UI Encountered by R.S. in 2018 and N.G. in 2021*

Walgreen provided, and Plaintiffs did not dispute, the UI that N.G. encountered in 2021, which featured a check-box accompanying a statement that "I read and agree to the Walgreens Terms of Use." Although the user did have to "click" something to advance, this is not a clickwrap agreement as the Ninth Circuit understands that term, contrary to Walgreen's contention. That is because the user is never actually presented with the terms and does not have to open them, let alone read them, before clicking to mark his or her purported assent. *See e.g., Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014); *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024). Instead, this is a form of sign-in wrap, in which "the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025). Here, "some action" refers to checking the box indicating that one agrees to the TOUs. As such, the enforceability of this purported agreement depends on the two-step test

from *Berman*, noted above.

At the first step, courts look to both the "context of the transaction" and "the visuals involved with the notice, such as font size, text placement, and overall screen design," to determine whether a "reasonably prudent internet user would have seen" the notice. *Chabolla*, 129 F.4th 1147, 1155. With regard to context, an agreement is more likely to be found if the nature of the transaction anticipates "some sort of continuing relationship … that would require some terms and conditions." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 477 (2021); *accord Chabolla*, 129 F.4th at 1155. Conversely, notice is less likely to be reasonably conspicuous in the context of a one-off transaction, since users are unlikely to expect that such a fleeting interaction would be governed by extensive contractual terms. *Sellers*, 73 Cal. App. 5th at 480.

Since both N.G. and R.S. created permanent Walgreens.com accounts—and apparently left them open for several years—it is reasonable to conclude that the context here was one of an ongoing relationship in which a user should expect to be "bound by terms, even if not explicitly told." *Chabolla*, 129 F.4th at 1155; *see also Keebaugh*, 100 F.4th at 1020. This element weighs in favor of finding notice.

As for the visual inquiry, the analysis is complicated by the fact that neither party has presented a screenshot for the 2018 UI with which R.G. would have interacted. However, Walgreen's declarant states that the earlier interface was "substantially similar" to the 2021 screenshot, in all the ways that matter to this analysis. Dkt. 31-2. Plaintiffs do not contest this description itself, except to say that R.G. does not remember the UI and that the declaration by Vishal Parekh is inadequate and lacks foundation. However, Walgreen cured these defects in its reply brief, and it is correct that a screenshot of the 2018 UI is not necessarily required. *See Namisnak v. Uber Techs., Inc.*, 315 F. Supp. 3d 1124, 1127-30 (N.D. Cal. 2018). This is especially true here, because Walgreen provides a screenshot of the 2021 interface and submits a declaration directly comparing the two with regard to the important features for the notice analysis. As such, the analysis below applies to both R.S. and N.G.

N.G. created her account in 2021, and the screenshot of that period's UI provides sufficient

evidence to evaluate whether there was conspicuous notice of the TOUs. The check-box was placed at the bottom of the page, just above the button to continue to the next page. The text next to the box read simply, "I read and agree to the Walgreens Terms of Use," with the latter phrase underlined and set off in blue text to indicate it was a hyperlink. Moreover, users were required to check this box before proceeding with account creation, so they could not wholly ignore the text, as was the case in *Chabolla* and *Berman.* Instead, this is more like *Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505, 516, where notice of terms was "conspicuously displayed directly above or below the action button." In the universe of Ninth Circuit cases, the visual features of the text and page design put this UI on the "conspicuous" side of the line. Looking at both context and design together, the 2021 account creation UI gave reasonably conspicuous notice of the TOUs.

Moving to the second step, courts ask whether the user took "some action that unambiguously manifests assent" to those terms. *Oberstein*, 60 F.4th at 515 (internal citation omitted). Clicking a button is deemed to manifest such unambiguous assent "only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement," and "the notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Berman*, 30 F.4th at 857-58.

Here, the check-box was accompanied by text that unambiguously and clearly explained that checking the box would mean the user "read and agreed to" the hyperlinked TOUs. True, in some cases, courts have required such text to include the additional phrase, "by clicking this button," to signify clearly the action required to manifest assent. *See Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 858. However, here users like R.S. and N.G. were required to click this button *before* clicking "next" to proceed. Their case is thus distinguishable from some other sign-in wrap cases where the "continue" button *itself* was the act meant to indicate assent, which made the user's intent in clicking that button more ambiguous. As discussed below, this feature also distinguishes R.S. and N.G.'s situation from the UI encountered by R.L. and I.P., because the text here assigned the check-box only one function, with straightforward (if

substantial) legal significance—assent to the TOUs.

As such, there was valid formation of an agreement to arbitrate with R.S. and N.G., even if they did not read the TOUs or subjectively intend to agree to the terms they contained. While this conclusion may seem unfair or unrealistic given the flood of TOUs that users encounter on the internet each day, it reflects the balance courts in California and the Ninth Circuit have struck between fair notice to users and predictability for businesses.

*2. R.L. and I.P.'s Vaccine Appointment Scheduling UI in 2024*

R.L. and I.P. had a different experience with the 2024 vaccine scheduling UI. That UI, captured in a screenshot above, presented users with a similar sign-in wrap template to the 2021 account creation page. However, key differences in the context of the transaction and the visual design of the UI lead to the conclusion that notice here was not "reasonably conspicuous," unlike in 2021.

First, the context here was precisely the sort of one-off transaction that courts have held is less likely to create inquiry notice for users. Unlike creating a permanent account, signing up for a single vaccine appointment does not necessarily trigger alarms that one is creating an ongoing relationship with the provider, let alone one that requires a dozen pages of terms and conditions or an arbitration clause governing *all* disputes with the company. It is immaterial that R.L. and I.P. came back to Walgreen later for additional vaccine appointments, as each instance was still a one-off transaction and neither Plaintiff created a permanent account on Walgreens.com.

The visual content of the page was also different in important ways. The check-box here was adjacent to a much larger block of text, and the line indicating that the user agreed to the TOUs was buried at the last line of that paragraph. A user quickly skimming the page could easily read the first few lines and conclude that this box referred only to the standard language governing text-message permissions, which is familiar and easily dismissed as boilerplate. True, the page did underline and color-offset the phrases Terms of Use and Privacy Policy, which might have increased the chances of catching users' eyes. However, burying those phrases in the last line of a paragraph otherwise dedicated to an entirely different purpose offsets those visual cues. The page

United States District Court
Northern District of California

also featured multiple footnotes, which users looking quickly for TOUs may have concluded were *all* the relevant terms for such a one-off interaction.[2] It is likely true that a careful reader who read the entire page would have identified the TOUs. However, that is not the standard by which the Ninth Circuit has evaluated conspicuous notice, as the careful reader could *always* find terms unless they are truly not presented at all; rather, the standard is a "reasonably prudent internet user," *Chabolla*, 129 F.4th at 1156. Here, the context suggests that such a user would not be on the lookout for TOUs other than those governing communications about their upcoming appointment.

For similar reasons, checking the box[3] did not unambiguously indicate assent to the TOUs. Per the lack of notice suggested by the analysis above, a user could easily have missed the line about TOUs and meant to assent only to receiving text messages—as R.L. and I.P. contend would have been their intent. Even if the user read the full paragraph, the language of the check-box left no way to assent *only* to text messages but not the rest of Walgreen's terms and conditions. Furthermore, while the first line included the phrase "by checking the box, I indicate," the last sentence referencing the TOUs did not, leaving it at least somewhat ambiguous as to what action indicated agreement to those terms. While the screenshot provided includes indentation that suggests the line is part of the paragraph attached to the check-box, it may not have appeared clearly as such on all device types by which users accessed the page.

In sum, Walgreen did not validly form arbitration agreements with R.L. or I.P., so they are not subject to binding arbitration. Walgreen's motion must therefore be denied as to those Plaintiffs.

---

[2] Walgreen notes that neither R.L. nor I.P. attested to having had this understanding of the page. However, it is well established that the formation of contracts is governed by an objective test. *Gates v. Gomez*, 60 F.3d 525, 530 (9th Cir. 1995). Therefore, Plaintiffs' subjective understanding of the communications is irrelevant, except as potential evidence of what any reasonable observer might think.

[3] R.L. and I.P. declared that they did not recall checking the box when they signed up for their vaccine appointments. Walgreen's reply brief refuted this point factually, based on the company's business records. However, this fact is not dispositive of the broader legal point about whether they were on reasonably conspicuous notice about the TOUs mentioned at the bottom of the paragraph next to the check-box.

B. Whether There Was a Valid Delegation Provision

Although "the general rule is that a district court decides whether a claim falls within the scope of an arbitration agreement, such questions 'can be expressly delegated to the arbitrator where the [contracting] parties *clearly and unmistakably* provide otherwise.'" *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 480 (9th Cir. 2024) (quoting *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (emphasis in original)). Most circuits, including the Ninth, have held that incorporation of an arbitrator's rules constitutes such evidence when the agreement was made between sophisticated parties. *Patrick*, 93 F.4th at 481. However, it is an open question in the Ninth Circuit whether that same rule applies to "consumer contracts between a sophisticated entity and an average unsophisticated consumer," at least if the latter provides some evidence of their sophistication or lack thereof to the district court. *Id.*

Here, Plaintiffs do provide some evidence, in the form of declarations, attesting to their lack of sophistication. All four of the named Plaintiffs attest that they have no legal training, had never heard of the AAA or NAM before, and did not understand that agreeing to the arbitrator's rules (which they disclaim doing) also meant delegating the issue of arbitrability to the arbitrator. Walgreen counters by citing this court's recent decision in *Slaviero v. Baby List*, No. 25-cv-09496-RS, 2026 WL 1097746, at *6 (N.D. Cal. April 22, 2026), in which a similar delegation clause was held enforceable under *Patrick* because plaintiffs did not produce evidence of their lack of sophistication. However, the cases are distinguishable. In *Slaviero*, plaintiffs made only "bald assertions in their opposition to this motion," and did not "supplement that statement with any competent evidence, such as declarations, permitting an inference that they could not grasp the mechanism of compelling arbitration of arbitrability used here." *Id.*

Here, Plaintiffs have submitted exactly those sorts of declarations. Dkt. 30-1, 30-2, 30-3, 30-4. Based on that evidence, it is reasonable to infer that these unsophisticated consumers lacked the knowledge and understanding of arbitration law necessary to grasp that a bare reference to which rules of arbitration would apply—buried in the TOUs and without any conspicuous explanation of its significance—waived an important right to have a court decide threshold issues of the validity of the arbitration clause. The incorporation statements are nondescript, stating

simply that the arbitration "shall be conducted" by a given organization "under its rules and procedures." No textual features mark this as an important point, and in the 2018 and 2021 terms the sentence is buried in the middle of a long paragraph. In the 2024 terms, the incorporation provision is the fourth paragraph out of seven under the "Dispute Resolution" header, the first of which has bolded text marking other important points (but not this one). Whatever significance the language at issue may have in other contexts, it was not a "*clear and unmistakable*" agreement to delegate in this context. As such, there is no valid delegation, and it is proper to assess the validity of the arbitration provision.

C. Whether the Arbitration Provisions Are Valid and Enforceable

The FAA § 2 "permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract.'" *AT&T Mobility LLC*, 563 U.S. at 339. Plaintiffs here assert only the defense of unconscionability. To prevail on that argument, Plaintiffs must show "both procedural and substantive unconscionability," although those two prongs "need not be present in the same degree" and are "evaluated on a sliding scale." *OTO, L.L.C. v. Kho*, 447 P.3d 680 (Cal. 2019) (internal citations and quotations omitted). Plaintiffs argue that the 2018 and 2021 TOUs were contracts of adhesion that contained substantively unconscionable terms. Walgreen disagrees on the later point, but also emphasizes that there is no procedural unconscionability, so the analysis need not reach the substantive terms of the agreement. For the reasons that follow, Defendant's argument is more persuasive as to procedural unconscionability, so it is unnecessary to reach the substantive prong.

*1. Procedural Unconscionability*

On the procedural prong, Plaintiffs argue that there was both oppression and surprise. "Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice." *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853. (2001). "Surprise is a function of the disappointed reasonable expectations of the weaker party . . . and can arise when the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms." *Heckman v. Live*

*Nation Entertainment, Inc.*, 120 F.4th 670, 682 (9th Cir. 2024) (internal quotations and citations omitted). The Ninth Circuit has held that *both* standards are "satisfied by a finding that the arbitration provision was presented on a take-it-or-leave-it basis and that it was oppressive due to 'an inequality of bargaining power that result[ed] in no real negotiation or an absence of meaningful choice." *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1281 (9th Cir. 2006) (en banc) (quoting *Flores*, 93 Cal. App. 4th at 853).

Here, Plaintiffs find oppression in the fact that Walgreens "required customers to accept the 2018 and 2021 Terms as written or forgo a walgreens.com account," rendering the TOUs a contract of adhesion. Next, they point out surprise arising from the fact that the arbitration terms were "buried" in the middle of a long, "general web-services agreement," which users may not have even opened. They contend that the 30-day window to opt-out by mail does not change the analysis because it was hidden in the same terms, so a user who was unaware of the provision would have no way of knowing he or she could opt out of it, rendering this choice illusory for many.

Walgreen's primary defense on this prong is that this cannot have been an adhesive contract because plaintiffs (1) had other options for the goods and services at issue, (2) were permitted by the terms to opt out of arbitration, and (3) were not obligated to create or maintain walgreens.com accounts in order to buy the company's goods and services.

Taken as a whole, Defendant's points are more persuasive on the procedural prong of unconscionability. Walgreen rightly explains that a contract is not adhesive if the signer had "meaningful choices" to buy the goods or services from alternative providers, "free of the terms claimed to be unconscionable." *Wayne v. Staples, Inc.*, 135 Cal. App. 4th 466, 482 (2006) (internal citation and quotation omitted). It may be a mere legal fiction that Plaintiffs had other "meaningful choices" that did not use similar arbitration agreements, but Plaintiffs have not met their burden of showing such a lack of options here.

It is also true that R.S. and N.G. were not obligated to create walgreens.com accounts to purchase Walgreen's goods or services, which distinguishes this case from others on which

United States District Court
Northern District of California

Plaintiffs rely. For example, *OTO* dealt with an employment contract and featured "significant oppression" because Kho "was required to sign the agreement to keep the job he had held for three years," not to mention that he would lose pay for each minute he spent reviewing the contract. *OTO, L.L.C.*, 8 Cal. 5th at 127. Here, Plaintiffs likely achieved some savings and convenience by creating an account, but they point to no way in which Walgreen forced them to sign up. As such, it would be incorrect to call these TOUs a contract of adhesion.

Finally, the opt-out provision is not dispositive of procedural unconscionability. *Rios v. HRB Digital LLC*, 807 F. Supp. 3d 975, 987-89 (examining Ninth Circuit and California cases and finding that a burdensome and potentially illusory opt-out provision had little weight in the analysis). To be sure, a valid opt-out would weigh in favor of enforceability. However, any flaws with the opt-out provision[4] here do not suffice to transform its presence into a factor that supports unconscionability; they only mitigate its impact in favor of enforceability. In sum, Plaintiffs have failed to establish that this contract was truly adhesive, or that it was otherwise marked by sufficient oppression and surprise to establish sufficient procedural unconscionability to prevent enforcement.

*2. Substantive Unconscionability*

Since there is no procedural unconscionability, Walgreen is correct that the analysis need not reach the issue of substantive unconscionability. *Slaviero*, 2026 WL 1097746, at *5.

D. <u>Walgreen's Motion to Stay</u>

Recapping the above analysis, R.L. and I.P. cannot be compelled to arbitrate their claims because they did not form an agreement to arbitrate with Walgreen. However, R.S. and N.G. did

---

[4] The provision here explains that opting out does not affect "any previous, other, or future arbitration agreements that you may have with us." Separately, the terms provide that "These Terms act as a binding agreement between you and us, and by accessing any Services in any way, you agree to be bound by all of them, including, but not limited to, **resolving disputes via binding arbitration**." Walgreens thus may purport to create a "future" or "other" arbitration agreement with users whenever they access services, even if they have opted out, rendering the opt-out illusory. However, Plaintiffs did not argue this point, and even if they had, it would not be sufficient on its own to change the procedural unconscionability analysis because the availability of alternatives meant that the TOUs were not a contract of adhesion.



United States District Court
Northern District of California

form such agreements. Although the delegation clause was invalid, the facts indicate that the agreement was not procedurally unconscionable and therefore must be enforced, pursuant to the FAA's "national policy favoring arbitration." *AT&T Mobility LLC*, 563 U.S. at 346 (internal citation omitted). This outcome raises the question of how to proceed with R.L. and I.P.'s claims on behalf of themselves and the putative class.

Walgreen argues that the entire case must be stayed because all the Plaintiffs raise similar claims. Such an outcome is not mandatory, however. The FAA § 3 mandates that a district court "shall … stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement," so long as the court is "satisfied that the issue involved in such suit or proceeding is referrable to arbitration under such an agreement." 9. U.S.C. § 3. Here, the dispute between R.L., I.P., and Walgreen is not an "issue referable to arbitration under an agreement in writing for such arbitration," because there is no such agreement between those parties.

In cases where the claims sent to arbitration have some bearing on the remaining claims, a district court has discretion to decide whether to stay the non-arbitrable claims, based on its "inherent power to control its docket and promote efficient use of judicial resources." *Dependable Highway Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007). A court's flexibility of decision is arguably even broader where, as here, the arbitrable claims have little or no bearing on the remaining claims. Nonetheless, that discretion is not unlimited. Courts should evaluate "three non-exclusive factors" in making such decisions: "(1) the possible damage which may result from the granting of a stay; (2) the hardship or inequity which a party may suffer in being required to go forward; and (3) the orderly course of justice measured in terms of simplifying or complicating of issues, proof, and questions of law." *In re PG&E Corporation Securities Litigation*, 100 F.4th 1076, 1085 (9th Cir. 2024) (internal quotations and citations omitted).

On the first two factors, the Ninth Circuit has held that "'if there is even a fair possibility that the stay … will 'work damage to some one else,' the stay may be inappropriate absent a showing by the moving party of 'hardship or inequity.'" *Dependable Highway Exp.*, 498 F.3d at

United States District Court
Northern District of California

1066 (quoting *Landis v. North American Co.*, 299 U.S. 248, 255 (1936)). Here, it would "work damage" to delay unduly the adjudication of R.L. and I.P.'s claims, as well as those of the putative class they seek to represent. The analysis from *McComack v. Marriott Ownership Resorts, Inc.*, No. 3:17-cv-01663, 2018 WL 424098, cited here by Walgreen, is illuminating by way of contrast. There, the court opted to stay a single plaintiff's non-arbitrable claims under California's Private Attorneys General Act (PAGA), which overlapped factually with her arbitrable claims. *Id.* at *5-6. The court explained a stay was not only warranted to "avoid duplicative proceedings as to the same issues," but was also appropriate because there were no "potential plaintiffs who will be prejudiced by the stay," noting that PAGA claims are representative actions but "not necessarily class actions." *Id.* To be sure, other courts have disagreed on whether to stay PAGA actions that overlap with related arbitrable claims. *See e.g., Winfrey v. Kmart Corp.*, 692 F. App'x 356, 357 (9th Cir. 2017) (upholding the district court's discretionary denial of such a stay). In any case, there is much greater potential damage from a stay here, because this is at least putatively a class action, not to mention the two named plaintiffs whose claims are not subject to arbitration. A stay would subject all these claims to an indefinite stay, pending the results of an arbitration in which these Plaintiffs have no part. The first factor thus weighs strongly against a discretionary stay.

Walgreen has not made any showing of hardship or inequity from allowing the claims to go forward, so the second factor also weighs against a stay or is, at most, neutral.

On the third factor, there is little reason to think that that staying the remaining claims would simplify the issues or preserve judicial resources. There is no credible argument that the arbitration of R.S. and N.G.'s claims will have any bearing on this court's adjudication of the non-arbitrable claims. Indeed, Walgreen's TOUs make clear that arbitration will be binding only on the individual parties, so even a favorable decision for R.S. or N.G. would be unavailing in court. Put another way, even if the arbitrator adjudicates similar facts, R.L. and I.P. would still have to present evidence substantiating the same facts here. Since "duplicative proceedings" will be necessary no matter what the arbitrator decides, this factor also weighs against a stay of the non-arbitrable claims.

United States District Court
Northern District of California

All three factors indicate a stay would be inappropriate here, so R.L. and I.P.'s claims will be allowed to proceed.

The next question is what to do with R.S. and N.G.'s claims while they navigate arbitration. At minimum, those individuals' claims must be stayed under the FAA, as Walgreen argues. Plaintiffs R.S. and N.G. should submit briefing as to how they wish to go forward procedurally, whether via a stay within this same action, severance of their claims into a separate action, or some other route.

## V. CONCLUSION

For the foregoing reasons, Defendant Walgreen's motion is granted as to Plaintiffs R.S. and N.G. but is denied as to Plaintiffs R.L. and I.P. Plaintiffs R.S. and N.G. should submit a proposed way forward within 30 days of this order.

**IT IS SO ORDERED**.

Dated: October 20, 2026



RICHARD SEEBORG
United States District Judge